UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Robert Joyce
_____

Write the full name of each plaintiff.

-against-

Consolidated Edison Company
of NEW York, Inc.
_____

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

1:22 CV 00801
(Include case number if one has been
assigned)

Amended
COMPLAINT

Do you want a jury trial?
☑ Yes    ☐ No

2022 SEP 28  PM 2:07
SDNY PRO SE OFFICE
RECEIVED

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

## I.    BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑    **Federal Question**

☐    **Diversity of Citizenship**

### A.    If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185

### B.    If you checked Diversity of Citizenship

#### 1.    Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
                        (Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                    (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, **Consolidated Edison.**, is incorporated under the laws of

the State of **New York**

and has its principal place of business in the State of **New York**

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in **New York, New York**.

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

**Robert**         **M.**         **Joyce**
First Name         Middle Initial         Last Name

**547 Westfield Dr.**
Street Address

**Valley Cottage**         **N.Y.**         **10989**
County, City         State         Zip Code

**917 576-9289**         **rj41926@gmail.com**
Telephone Number         Email Address (if available)

## B.   Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:    Consolidated Edison Company of New York, Inc

First Name                          Last Name

Current Job Title (or other identifying information)

4 Irving Pl

Current Work Address (or other address where defendant may be served)

New York                     NY                    10003

County, City                        State                       Zip Code

Defendant 2:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                        State                       Zip Code

Defendant 3:

First Name                          Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                        State                       Zip Code

Defendant 4:

_____    _____
First Name                          Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City                    State            Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: Manhattan, N.Y.

Date(s) of occurrence: September 30, 2021

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

The Union failed to represent me
and Con Edison breached the CDA

See Attached

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Vacate Arbitrators Award
Reinstatement back to work.
Full back pay.
Other further relief this court deems just and proper

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 9/28/21 | Robert Jr |
| --- | --- |
| Dated | Plaintiff's Signature |

| Robert | M. | Joyce |
| --- | --- | --- |
| First Name | Middle Initial | Last Name |

547 Westfield Dr.
Street Address

| Valley Cottage | N.Y. | 10989 |
| --- | --- | --- |
| County, City | State | Zip Code |

| 917 576 9289 | Mj41926@gmail.com |
| --- | --- |
| Telephone Number | Email Address (if available) |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☐ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

**Facts**

1. Robert Joyce's (Petitioner) adjusted hire date with Con Edison was July 4, 2009.

2. The Petitioner was a member of Utility Workers Union of America, AFL-CIO, Local 1-2 ("Union").

3. The Petitioner's job title was a Distribution Splicer.

4. The Petitioner submitted to a drug screening on January 29, 2021.

5. On February 8, 2021, Con Edison's MRO informed the Petitioner that his urine sample tested positive for methamphetamine.

6. Also on February 8, 2021, the Petitioner requested that his split specimen sample be sent out to another laboratory for testing.

7. On February 22, 2021, Con Edison's MRO informed the Petitioner that his split sample reconfirmed the presence of the drug.

8. On March 1, 2021, Con Edison's MRO verified the primary sample by completing the MRO Chain of Custody form ("CCF") and dating the form on March 1, 2021.

9. Subsequently, The Petitioner's employment was terminated four days later on March 5, 2021.

10. The Union filed a grievance on the Petitioner's behalf on March 24, 2021.

11. The arbitration hearing was held on August  3 and August 17, 2021.

12. On September 30, 2021, the Arbitrator denied the grievance. (See Exhibit A Arbitrators written award).

**The Union failed to enforce the CBA for the Petitioner and
neglected to investigate why Con Edison was illegally
withholding documents from the Petitioner**

13. The Petitioner never ingested the drug that he was terminated for and to try to
prove his innocence the Petitioner started requesting documents from the test he
was terminated for to see if the sample was mishandled or mislabeled or maybe
not even tested at all (Evidence shows split sample wasn't tested).

14. Con Edison failed to provide the documents that they were legally required to
provide to the Petitioner upon his written requests.

15. Data Packages, commonly referred to as Litigation Packages, are internal
laboratory documents that consist of the type of equipment used when testing the
sample, calibration of that equipment, testing methodology, storage procedures,
internal laboratory chain of custody forms ("CCFs") among other documents.

16. The Petitioner had to make a written request…"made through the MRO…" to the
laboratories for the "Litigation Packages" and Con Edison's MRO was required to
forward the Plaintiff's written request to the laboratories. (See 49 CFR § 40
329)(b).

17. Upon receiving the Plaintiff's written request from the MRO the laboratories were
required to turn over the Litigation Packages and the documents were required to
be in the Petitioner's possession within ten business days of the Petitioner's
request.(See 49 CFR § 40.329)(b).

18. The Litigation Packages are "…adequate means ( e.g., documentary evidence)
through which employees can raise issues about the testing process." (SEE
Exhibit B - Federal Register VOL. 65 79526, December 19, 2000).

19. Con Ediso's MRO **never** forwarded the Petitioner's multiple written requests for the Litigation Packages to the laboratories and the Petitioner was never given an opportunity to review these documents and Union agent Steven Dauria informed the Petitioner in an email dated May 17, 2021, "...I can again only ask them...and see if that helps.

20. The split specimen laboratory was only one of 22 approved Health and Human Services ("HHS") laboratories in the United States that was approved to conduct workplace drug testing at the time and each laboratory was required to handle and document each specimen as if the results of the test will end up in future litigation.

21. One of the MRO's roles is to oversee the performance of the laboratories that are providing critical services for Con Edison to ensure the compliance with DOT regulations and he is in fact the "gatekeeper" to the entire drug testing process.

22. There is absolutely no reason why the MRO should not have forwarded the Petitioner's requests to the laboratories.

23. The Union failed to do any kind of preliminary investigation into the MRO's negligence for refusing to forward the Petitioner's written requests to the laboratories.

24. Along with the litigation packages, the CCFs are an integral component of the drug testing process and the laboratory CCF is how laboratories report drug test results to the MRO.

25. The MRO copy of the CCF is how an MRO is required to report results to the Designated Employee Representative ("DER").

26. The two completed CCFs were required to be in the MRO's possession in order for him to verify the split specimen results.( See 49 CFR § 40.129)(b)(1)(2).

27. Upon a written request from the Petitioner ConEd's MRO was required to turn over the two CCFs to the Petitioner and the two documents were required to be in the Petitioner's possession within ten business days of his request. (See 49 CFR § 40.329(a).

28. The Petitioner's first written request for the Litigation Packages and the CCFs was made on March 11, 2021, so the Petitioner should have received all the documents by March 24, 2021.

29. Despite five more written requests and two follow up emails to these requests the Litigation Packages were never produced and the two CCFs were forwarded to the Union almost two months late and those forms turned out to be incomplete and insufficient to terminate Petitioner's employment as ConEd admitted themselves at the Arbitration hearing and in their final written argument to the Arbitrator. (See Exhibit C - Petitioners Six written requests for documents)

30. ConEd knew they were obligated to turn over the documents the Petitioner requested. Instead of complying, Con Edison sent the Petitioner hundreds of documents on April 16, 2021, but failed to include even one document the Petitioner requested.

31. The documents the Petitioner did receive consisted of old CCFs from prior drug tests the Petitoner submitted to while working for ConEd, yearly physicals, hearing and breathing tests, a ConEd medical questionnaire, an affidavit from a

prior drug screen the Petitioner submitted to for ConEd among many other documents.

32. The Petitioner proceeded to send another written request to the MRO on April 20, 2021, and this request was also ignored.

33. On or about May 3, 2021, the senior business agent, Frank Morales, told another shop steward in Petitioner's department that the Petitioner was bitter and making ridiculous requests to Con Ed by requesting his entire medical file. These statements made by the senior business agent were false.

34. On May 3, 2021, the Petitioner sent a group text message to the senior business agent, Frank Morales, and the business agent Steve Dauria, and the Petitioner informed the two agents that he didn't request his entire medical file. ( See Exhibit D - text message from Petitioner to two Union agents)

35. The Petitioner also sent pictures of his written requests to the two Union agents which show the Petitioner was only requesting documents pertaining to drug tests.

36. In the same text message from May 3, 2021, the Petitioner also informed the two agents that it was 53 days since the Petitioner sent his first written request to ConEd's MRO and ConEd has still failed to turn over the documents and asked the two agents "That doesn't raise any concern with you guys?." The two agents neglected to answer.  (See Exhibit D -. Text message).

37. The Petitioner was informing the Union agents, once again, of Con Edison's misconduct in an attempt to get the Union to advocate and represent the

Petitioner and to pressure ConEd to abide by the CBA and release the documents. The Petitioner's attempts to get the Union agents involved failed.

38. In an email dated May 13, 2021, from Union business agent Steven Dauria to the Petitioner the agent stated "Again I also told you on 5/6 that what you request and what I request are different. What you request from the company you have to handle with you and the company." (See Exhibit E - email from Union agent)

39. The Union agent informed the Petitioner that he was on his own trying to enforce the CBA with ConEd and that he was also on his own trying to obtain the documents ConEd was illegally withholding from him.

40. The fact that ConEd was illegally withholding back the documents that were required to be in their possession before the Petitioner's termination was a question that should have elevated the Union representative's concerns and caused them to initiate an investigation, but it **didn't.**

41. The Union failed to do any minimal investigation into why Con Edison was illegally withholding documents that were required to be in the MROs possession before the Petitioner's employment was terminated on March 5, 2021.

42. A union "has a duty to represent fairly all employees subject to the collective bargaining agreement." Spellacy v. Airline Pilots Ass'n Int'l, 156 F.3d 120, 126 (2d Cir. 1998) (citing Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991))

**Con Edison fails to follow the CBA but instead follows their own corporate instructions and the Union goes along with it and neglects to challenge Con Edison.**

43. **Article X - Section 41 (3)** of the Collective Bargaining Agreement ("CBA") states drug testing procedures shall follow "…the Department of Transportation Procedures for Transportation Workplace Drug Testing Programs

44. Con Edison's corporate instruction 560-4 (See Exhibit G - Con Edison's corporate instructions) on alcohol and drug testing violates Article X-Section of the CBA that reads "No rule, procedure, or practice of the Management shall be contrary to any provision of this Contract."

45. The Union allowed Con Edison to create a policy that has less protection for members that have or had issues with alcohol or drugs, restricts the members access to documentation pertaining to the tests and is in direct violation of the CBA.

46. When DOT regulation 49 CFR § 40.323(a)(1)(2) and the section 5.9(b)(3) in Con Edison's corporate instruction 560-4 are reviewed and compared it is indisputable that Con Edison took the paragraph right from the DOT regulations and inserted it into their corporate policy but with some major changes and one very critical omission. (See Exhibit I - 49 CFR § 40.323(a)(1)(2) & (See Exhibit G - Con Edison's corporate instructions 5.9(b)(3).'

47. Con Edison's policy allows Con Edison to release an employee's drug and alcohol records "or information" for any civil or criminal case. Con Edison adds in "or information" which removes any protection for an employee.

48. Dot regulation 40.323(d) states an employer must notify the employee immediately if information is released and Con Edison's policy does not include this mandate.

49. The Petitioner highlights Con Edison's corporate policy to show Con Edison's bias towards employees recovering from substance abuse, and also displays the Unions lack of concern.

50. This explains why Con Edison was comfortable ignoring the six written requests from the Petitioner and the Union simply went along with the company's policy.

51. Con Edison's policy does not give an employee any avenue to obtain and review the "Litigation Packages". A laboratory won't release documents, discuss test results or have any communication whatsoever with a donor of a sample as the Petitioner found out.

52. The Petitioner never received the litigation packages from the laboratory which is another example of Con Edison and the Union following Con Edison's procedures.

53. Con Edison's policy allows employees to request documents (CCFs) that Con Edison's medical department is in possession of but it fails to include any time period of when Con Edison has to produce the documents.

54. According to the CBA the Petitioner was required to have the CCFs in his possession "...within 10 business days..." which should have been March 24, 2021, but Con Edison never forwarded the CCFs to the Petitioner.

55. The Union allowed Con Edison to violate Article II - Section 49 (2) of the CBA that reads "Relevant Company medical records requested by the Union in writing shall be provided upon receipt of an appropriate written release from the employee authorizing such disclosure to the Union." (See Exhibit J - CBA)

56. The Petitioner provided an appropriate written release on March 24, 2021, that allowed Con Edison to release any records to the Union.

57. In an email dated April 8, 2021, Union business agent Steven Dauria stated to the Petitioner that "I will follow up with the company as we have also not received the information requested. The Union has only received confirmation of receipt from the company on 3/31." (See Exhibit K - Email from Union agent)

58. According to the CBA that the Union is required to enforce for its members Con Edison was required to provide the CCFs to the Union upon receipt which was provided on March 31, 2021.

59. In a text message from Union agent Steven Dauria to the Petitioner on April 23, 2021, the agent states  "This I asked for and other information is not the same with yours and they have time to send me that stuff." (See Exhibit L - Text message from Union agent).

60. The Union business agent is allowing Con Edison to violate the contract and is also being dishonest to the Plaintiff while Con Edison fails to turn over the two CCFs.

61. This was another clause in the contract that Con Ed and the Union failed to abide by regarding the two CCFs being released to the Plaintiff and is another example of the Union and Con Edison following Con Edison's corporate policy that has no time period of when the documents should be produced.

62. Con Edison violated the CBA again, but not their corporate instructions, when they requested a hearing with the New York State Department of Labor ("NYSDOL") to protest the Petitioner receiving unemployment benefits and Con

Edison failed to notify the Petitioner that information was released of Petitioner's. (See 49 CFR § 40.323 (a)(d).

63. At the hearing held on June 3, 2021, that Con Edison requested on April 22, 2021, a Con Edison representative informed the NYS judge that ConEd  was not prepared to present their case at that time and the judge informed Con Edison that they could, in a timely fashion, request another hearing when they were prepared.

64. Con Edison declined to request another hearing even though they originally asked for the opportunity to present evidence and witnesses.

65. The Petitioner sent multiple emails to the two Union agents Frank Morales and Steven Dauria informing them that Con Edison violated the CBA (again) requesting the hearing and asked the Union agents to have a Con Edison representative justify their actions. The emails were met with silence. (See Exhibit M - Emails from Petitioner to Union agents dated June 4, 2021 & June 7, 2021.)

66. The Petitioner sent an email on June 14, 2021, to the Union President, James Shillitto, and informed him of Con Edison's misconduct.  The emails were blocked from going through. (See Exhibit N - Email to Union President)

67. A month after the Petitioner initially informed the Union agents of Con Edison's actions violating the CBA by requesting the unemployment hearing and then not being prepared for the hearing the Petitioner asked the Union agent once again to investigate.

68. In an email dated July 6, 2021, that he didn't ask a Con Edison representative to justify Con Edison's actions because the Con Edison representative would not have answered and also stated "Those cases have nothing to do with the Union. He knows that also. The company is only looking at arbitration."  (See Exhibit **O** - Email from Union agent Steven Dauria)

69. For the business agent to state "Those cases have nothing to do with the Union" when the CBA was violated by Con Edison who initiated the unemployment hearing is more evidence that the Union was not enforcing the CBA for the Plaintiff but the Union was enforcing Con Edison's corporate instructions against the Petitioner.

70. The Union agent also shows that his interests were aligned with Con Edison's interests when he stated "The company is only looking at arbitration."

71.  Con Edison requested the hearing which proves Con Edison was looking at the unemployment hearing at one time and not just the arbitration like the Union agent claimed.

72. Con Edison and the Union were following the company's policy on alcohol and drug testing throughout this entire process and this was a major contributing factor to the Plaintiff's injuries.

73.  Another example of the Union agents not enforcing the CBA for the Plaintiff is when Con Edison finally turned over the two CCFs to the Union on May 18, 2021. (See Exhibit P- Email from Union Agent Steven Dauria to Petitioner with the CCFs attached.) (See Exhibit P1- laboratory copy of CCF) (Exhibit P2-  MRO copy of CCF). They accepted without challenge.

74. The two incomplete forms were not sufficient enough to terminate the Plaintiff's employment according to the CBA and the Union representatives took no action. It was the biggest development of the case and was proof the Petitioner's split sample was never tested.

75. The Petitioner sent multiple emails to the two Union agents about the CCFs being incomplete to terminate Petitioner's employment and the Petitioner's emails were all met with silence.

76. The Union failed to do any kind of investigation into the matter and did not say one word to the Petitioner about this fatal flaw.  (See Exhibit Q - Email from Petitioner to Union Agents Frank Morales & Steven Dauria dated May 21, 2021).

77. No matter what circumstances unfolded through this process and no matter what illegal and dishonest behavior Con Edison displayed, the Petitioner was unable to get any representation from the business agent or senior business agent.

78.  The two Union agents even failed to respond in the email that the Petitioner sent to ConEd's MRO on May 24, 2021, when the Petitioner notified the MRO that the test was required to be canceled due to the empty split specimen sections.  (See Exhibit S - email from Petitioner to MRO.and two Union agents, ConEd HR rep, Petitioners manage cc'd in email)

79. The complete silence from the Union towards ConEd regarding these fatal flaws was more evidence for Con Edison that the Petitioner was on his own and lacked any kind of representation. Con Edison's representative's knew they could continue to carry on with their corrupt misconduct and knew they would get no opposition from the Union.

80. **The evidence clearly establishes that the defendant violated the CBA and DOT regulations that required this test to be canceled due to fact the** ~~evidence shows the split specimen was never tested.~~

81. The split specimen laboratory that was tasked with testing the Petitioner's split specimen was required to report the results by completing and transmitting a fully completed copy of the laboratory CCF to the MRO in February but the laboratory failed to do this. (See 49 CFR § 40.183)(a)(b) &( See 49 CFR § 40.185(a)(b)(c).

82. 49 CFR 40..129(g)(2) states "as an MRO employed directly by a company, you must not tell anyone on the company's staff or management that you have received an employee's laboratory confirmed test result" until the MRO has the CCFs in his possession to verify the results.

83. On May 18, 2021, ConEd turned over the two CCFs, two months later than required (according to two clauses in the CBA) to the Union and the two split specimen sections on the two CCFs were completely empty. (See Exhibit P- email from Union agent Steven Dauria to Petitioner).(See Exhibit PI- laboratory copy of CCF) (See Exhibit P2- MRO copy of CCF)

84. ConEd's MRO and the Union took no action when the Petitioner sent an email to ConEd's MRO, Jefferey Moskowitz, on May 24, 2021, and informed the MRO there was no certifying scientist's signature confirming the laboratory's findings for the split sample and his signature was also missing on the MRO CCF verifying the split sample results, the sections were completely empty, and the Plaintiff asked the MRO to cancel the test. (See Exhibit S - email from Petitioner to MRO).

85. The Plaintiff cc'd a Con Edison Human Resources representative, Plaintiff's manager at Con Edison and the two Union agents in the email. The two Union agents failed to respond in the email and took no action and the MRO who was required to "...act and investigate problems when possible..." took no action. (See 49 CFR § 40.123)(e).

86. In order to appear to comply with Article XII - Section 49 (2) of the CBA Con Edison's attorney forwarded the **same two incomplete** CCFs to the Union's attorney on July 26, 2021,'... seven calendar days prior to the opening of the arbitration hearing..." (See Exhibit T - CBA) (See Exhibit U - Email from Con Edison's attorney to Union lawyer) (See Exhibit U1 - incomplete laboratory copy of the CCF) (See Exhibit U2 - incomplete MRO copy of the CCF).

87. ConEd's MRO was required to have a fully completed, clear and legible copy of the laboratory CCF and a copy of the MRO CCF in his possession before he could verify the results of the Plaintiff's split sample. (See 49 CFR §.129)(b)(1)(2).

88. The MRO was required to review the two CCFs and ensure that the information was consistent on both forms.(See 49 CFR § 40.129)(a)(1)(2).

89. The CCFs had to be inspected for any fatal or correctable flaws and the MRO was required to ensure that the certifying scientist signed the laboratory CCF for the split specimen results. (See 49 CFR § 40.129)(a)(1)(2).

90. ConEd's MRO was responsible to provide a quality assurance review of the drug testing process and ensure the review of the CCFs. (See 49 § CFR 40.123)(b)(1).

91. Six out of the eight responsibilities listed for an MRO Con Edison's MRO failed at.

92. Despite the CBA and DOT regulations requiring cancellation of the Petitioner's test result due to the failures of the laboratory and the MRO surrounding the split sample, Con Edison's MRO and/or lawyer made the decision to plan, prepare and defend the Petitioner's termination with the incomplete CCFs.

93. This decision was made even though the split specimen laboratory failed to complete the simple but critical and required step of reporting the results to the MRO by transmitting a copy of the laboratory CCF to the MRO with section 5(b) fully completed with the certifying scientist's signature.

94. It is extremely important to point out that laboratories that test split specimen samples are informed of what specific drug/drug metabolites to test for and are only required to test for the presence of that drug without regard to the cutoff concentrations. Numerical values are not reported (See 49 CFR § 40.177) (a)(b).

95. An MRO must cancel the test if a certifying scientist's signature is missing on a laboratory's CCF for a positive result if the correction is not made.(See 49 CFR § 40.203)(d)(2).

96. Not just a scientist's signature was missing, but the entire split specimen section was completely empty.

97. 49 CFR § 40.205 (a)(1) of the DOT regulations state "if, **during or shortly after** the collection process…" (40.205)(b) states, " If, as a collector, laboratory, MRO, employer,…become aware of a problem that can be corrected…you must take all practicable action to correct the problem so the test is not canceled." (See 49 CFR § 40.205(a)(1)(b).

98. 49 CFR § 40.205 (c) states"If the correction does not take place, as the MRO you must cancel the test."  (See 49 CFR § 40.205 ( c ).

99. DOT regulations 49 CFR § 40.203 and 40.205 explain why the MRO was required to cancel the test results. These two DOT regulations were submitted into evidence in their entirety at the arbitration hearing for the Arbitrator's convenience.

100.    Built-in safeguards in DOT rule 49 CFR Part 40 were not followed and at least 16 different regulations were violated when the Petitioner's sample was processed.

101.    Split specimen testing was a right afforded to workers with the passing of public law 102-143. The law protects a worker from contamination, contaminated equipment, laboratory mixups, human errors and false positive results. Split specimen testing is an employee's right to due process.

102.    After the initial laboratory reported a positive result for the Petitioner's (primary) sample ConEd and the Union discriminated against the Petitioner because of his two visits to a drug rehabilitation center, for prescription opioid use, from five and six years earlier and the built in safeguards for the split specimen sample, and the importance of confirming if the test ever happened, were not followed and no longer mattered to ConEd and the Union because they viewed the Petitioner as guilty and just a drug addict.

103.    The Petitioner was even terminated four days after the MRO signed off on the MRO CCF for the primary sample and not the split specimen like Con Edison

claimed. (See Exhibit - P2 MRO copy signed off 3/1/21 and Petitioner terminated 3/5/21).

104.   The Petitioner was deprived of having a split specimen test done on his sample which would have proved the first test was contaminated or mishandled.

105.   The Union allowed ConEd to grossly violate the employee's due process rights which is another reason the split specimen sample was created.

106.   The split specimen laboratory, Quest Diagnostic in Tucker,Georgia, announced on January 5, 2021, that their last day of accepting and receiving urine samples would be on March 6, 2021, and they were already in the process of changes and redirecting samples to there other two laboratories that offer DOT workplace drug testing located in Kansas and Pennsylvania. (See Exhibit - V)

107.   The laboratory was three weeks away from some major changes that were coming for the laboratory and the employees working there when they supposedly tested the Petitioner's split sample.

108.   Laboratories that test split specimen samples are informed of what specific drug/drug metabolites to test for and are only required to test for the presence of that drug without regard to the cutoff concentrations (See 49 CFR § 40.177) (a)(b).

109.   The laboratories only have to report if a sample "Reconfirmed" or "failed to Reconfirm" the presence of the drug that was found in the original (primary) sample. (See 49 CFR § 40.183(a).

110.   This system creates opportunities for overworked laboratory workers to

simply state "reconfirmed" especially at a laboratory that was processing millions

of samples a year and was in the midst of some major changes.

111.   Con Edison's attorney falsely writes in Con Edison's closing argument that "It

is noteworthy that the results from the second lab's tests were nearly *identical* to

those of the first test analyzed by the PA lab..

112.   Con Edison's attorney makes at least 30 false statements in Con Edison's

closing written argument and two of those statements are about the numerical

values being equal in both specimens. The Union failed to challenge these false

assertions.

### The Union allows Con Edison to delay the Arbitration hearing with no protest which will lead to Con Edison's severe misconduct and fraudulent behavior.

113.   The two Union agents allowed Con Edison's attorney to delay the 2021

arbitration a month just so Con Edison's attorney could avoid the Arbitrator from

2016 who was already a witness to Con Edison's corrupt evidence handling.

114.   Petitioner sent an email to the senior business agent, Frank Morales, on June

28, 2021, and the Plaintiff asked the senior agent to try to get him reinstated

before the arbitration hearing because the termination was in direct violation of

the CBA. (See Exhibit X- email from  Petitioner to senior Union agent Frank

Morales).

115.   The Petitioner also asked the senior Union agent ``How was the company

allowed to delay my arbitration without any protest from my Union?." Plaintiff's

email and questions were met with silence. (See Exhibit X)

116.    On July 6, 2021, the Petitioner sent an email to Union business agent Steven

Dauria and asked "...who from the company delayed my arbitration and what

was the reason?". (See Exhibit O - Email from Petitioner to Union Agent).

117.    The agent responded back stating "It wasn't delayed it was moved and that

was Coned attorny and also arbitrator changed it, they weren't ready. So that

would be their attorney and arbitrator." (See Exhibit O Email response from Union

agent Steven Dauria).

118.    Why and how was ConEd's attorney not ready for the arbitration hearing in

July? The Plaintiff was terminated March 5, 2021!

119.    The Union agent also claiming that besides ConEd's attorney "...also

arbitrator changed it..." is just another false statement from the business agent.

120.   Con Edison's attorney wanted to avoid the Arbitrator from the previous

hearing in 2016 who witnessed Con Edison's attorney's willingness to

proceed in a termination with fabricated and conflicting evidence.

121.    In July of 2016 the Petitioner was terminated when a collector claimed "the

Plaintiff tried cheating on an observed urine collection. The Petitioner did not

cheat or try to cheat on the test in any way. Petitioner reported to ConEd's

medical facility to provide an observed urine sample which Plaintiff had submitted

to many times already.

122.    After the observed collection was completed there was a disagreement

between the Plaintiff and the collector which had seemed to be resolved right

there. The collector made the accusation after the test was done and the Plaintiff

had left the testing facility.

123.    Con Edison moved forward with the termination and Plaintiff's employment was terminated in late July of 2016. ConEd labeled it a "refusal to test'.

124.    The termination was brought before an Arbitrator in October of 2016, and the Arbitrator, without hearing the case, informed both parties that she was not upholding the termination and to work out a deal to bring Plaintiff back to work.

125.    The evidence submitted by ConEd's attorney for the 2016 arbitration hearing were two conflicting written statements from the collector and a Chain of Custody form (CCF) from the collection in July of 2016 that was of poor quality and looked to be deliberately whited out to prevent information on the form from being visible. (See Exhibit Y - CCF from 2016) (Y1-- written statement from collector on exit interview -Y2 - written statement).

126.    However, even with the poor quality of the form, the form still showed an observed urine collection took place and an observed urine collection was completed discrediting the company's and collector's claims that Petitioner was caught trying to cheat on a drug test. (See Exhibit Y - CCF from 2016).

127.    Con Edison's attorney in 2016 was Amy Gladstone, the same attorney that argued for the Plaintiff's termination to be upheld in 2021 and who also knowingly made at least 30 false statements in Con Ed's 2021 final written argument to the Arbitrator which will be addressed later.

128.    The Arbitrator from 2016, notified the attorneys in their private meeting, **without** hearing the case, that she would not be upholding the termination of the Petitioner for a "refusal to test' due to the evidence Con Edison submitted and

instructed the parties to work out an agreement to bring the Petitioner back to work.

129.    Con Ed's attorney in 2021 wanted to stay away from the 2016 Arbitrator especially with the flawed evidence that ConEd's attorney was in possession of for the 2021 arbitration hearing. The Union allowed the delay and allowed the change of Arbitrator with no protest whatsoever.

**The Arbitration was tainted by Con Edison's manipulation of evidence and the Union not intervening at all through the entire process, especially when Con Edison produced the incomplete CCFs on May 18, 2021, allowed Con Edison to feel comfortable enough to complete the CCFs on the eve of the hearing and then take it even further with the manipulation of evidence.**

130.    Con Edison forwarded the two CCFs with both split specimen sections empty to the Union on May 18, 2021 (See Exhibit - P1 & P2), and then submitted the same two incomplete CCFs to the Union attorney on July 26, 2021, for the Arbitration hearing the following week. (See Exhibit - Q1- Q2)

131.    Initially, ConEd's MRO and lawyer made the decision to plan, prepare and defend the case to uphold the Plaintiff's termination with the empty split specimen sections.

132.    Then on Monday August 2, 2021, the day before the arbitration hearing and five months after the Petitioner was terminated, Con Edison abruptly changed their strategy and submitted two new CCFs into evidence.

133.    The entire email ConEd's MRO forwarded to Con Edison's attorney, with the two new CCFs attached, was sent to the Arbitrator and the Union attorney and

the email shows that ConEd's attorney and MRO were planning on defending the

incomplete CCFs. (See Exhibit Z- Email from Con Edison's MRO to attorney.)

134.    The email was further proof that Con Edison's attorney and MRO were

planning on defending the termination with the incomplete CCFs.

135.    The laboratory copy of the CCF now had a rubber stamped date of February

17, 2021, a rubber stamped name of the scientist and the scientist's signature.

(See Exhibit AA - laboratory copy of the CCF that was produced on eve of

arbitration hearing and six months late.)

136.    The date of February 17, 2021, was the date the laboratory was required to

transmit the CCF to the MRO so the fact that they didn't transmit the form until

August 2, 2021, discredits that date and the Chain of Custody was irrevocably

broken.

137.    The MRO's copy of the CCF now had the MRO signing and printing his name

and verifying the laboratory's findings for the split specimen sample with a date of

August 2, 2021. (See Exhibit BB - MRO copy of the CCF that was produced on

eve of Arbitration hearing and six months late.)

138.    DOT regulation 40.205 (b)(1) addresses how to correct problems on CCFs
and it states "If the problem resulted from the omission of required information,
you must, as the person responsible for providing that information, supply in
writing the missing information and a statement that is true and accurate...You
must supply this information on the same business day on which you are notified
of the problem, transmitting it by fax or courier." (See 49 CFR 40.205(b)(1)).

139.    A written statement (memorandum/affidavit) must accompany the CCF and

the form itself must be marked ("e.g, stamp noting correction") so that it is

"obvious" on the CCF that a problem was corrected (See 49 CFR §

40.205)(b)(3)(4) (See 49 CFR § 40.205(b)(3)(4).

140.    No written statements, or affidavits, were provided for the major errors

(missing required information) that occurred during the handling and testing of

the Petitioner's split sample and the CCFs weren't marked to make it "obvious"

on the form that a problem was corrected.

141.    However, the problem should be corrected "…**during or shortly** after the

collection process". (See 49 CFR 40.205)(a)(1).

142.    Shortly after the collection process does not mean 186 days after the

collection process, January 29, 2021, which was when the Plaintiff's sample was

collected.

143.    ConEd's MRO did not want any "written statements or affidavits"

accompanying the CCFs because it would prove the test was required to be

canceled.

144.    Ironically, an MRO "…must ensure the timely flow of test results." (See 49

CFR 40.123(f).

145.    The MRO neglected his first responsibility as an MRO and failed to be an

"advocate" for the "accuracy" and "integrity" of the drug testing process even

though the Plaintiff's career was on the line and the evidence showed the

Petitioner's split specimen wasn't tested. (See 49 CFR § 40.123)(a).

146.    The MRO's only concern became trying to cover up the major errors he made

and the major errors he allowed the split specimen laboratory to make with the

handling and testing of the Petitioner's sample.

147.   When the incomplete CCFs were turned over on May 18, 2021, the Union failed to question ConEd in any way whatsoever even though the forms proved the Petitioner was terminated in direct violation of the CBA.

148.   The Union neglected to oppose or challenge Con Edison in any way and gave ConEd the freedom and audacity to manipulate the evidence and complete the two split specimen sections on the two CCFs the day before the hearing.

149.   The Union agents failed to respond in the email that they were included in when the Petitioner sent an email to the MRO on May 24, 2021, informing the MRO that the test should be canceled due to the empty split specimen sections. (See Exhibit R - Email from Petitioner to MRO informing MRO that the test should be canceled).

150.   On July 30, 2021, Con Edison's attorney submitted an arbitration award from 1987 into evidence. ConEd's attorney specifically told the Arbitrator "I also attached an arbitration award that supports the Company's position in this matter."

151.   The evidence strongly suggests that the Arbitrator informed Con Edison's attorney that the evidence of the arbitration award would not suffice to uphold the termination with the split specimen sections completely empty.

152.   The Arbitrator should not even have heard the case and should have ordered the Petitioner back to work but instead the Arbitrator informed ConEd's attorney more evidence was required to uphold Petitioner's termination even though that evidence didn't exist.

153.   The very next business day August 2, 2021, the MRO forwarded the two new CCFs to Con Edison's attorney and said the documents "were retrieved from the files." (See Exhibit Z - Email from Con Edison's attorney to MRO).

154.   The arbitration hearing was held on August 3 & 17, 2021. During the Petitioner's direct examination the Petitioner referenced a specific DOT regulation that the Union attorney didn't submit into evidence in its entirety which led to ConEd's attorney objecting and stating that she didn't have that specific DOT regulation in front of her and it shouldn't be allowed into evidence.

155.   The Arbitrator immediately agreed with ConEd's attorney and stated only the DOT regulations that the Union submitted into evidence in their entirety would be allowed into evidence. (Exhibit DD - email dated October 5, 2021, from Petitioner to Union attorney Micah Wissinger and Union agent Steven Dauria referring to the Arbitrator stating he was disregarding certain DOT regulations.)

156.   The Union's attorney not objecting to this is more evidence that the Union wasn't representing Plaintiff faithfully.

157.   Regardless, two of the regulations that were submitted into evidence in their entirety for the Arbitrator's convenience, (40.203&40.205), show the test should have been canceled.

158.   However, the seasoned Arbitrator stating that he was disregarding parts of the most important clause in the CBA regarding Petitioner's termination hearing is troubling.

159.   Article XII - Section 49 (3)(a) states "An Arbitrator shall have no jurisdiction, power or authority to amend, modify, supplement, vary or disregard any provision of this Contract in any respect whatsoever."

160.   Ironically, Con Ed's attorney refers to DOT regulations as a "joint exhibit" in Con Edison's closing argument and the Arbitrator does the same in the Arbitrator's written award and this is after ConEd's attorney objected and the Arbitrator agreed that all DOT regulations would not be allowed into evidence.

161.   After this incident at the arbitration hearing that was being conducted on Zoom, ConEd's attorney requested a private meeting with the Arbitrator and the Union attorney.

162.   Subsequently, the Union attorney and business agent called the Petitioner back and said the Union was about to agree that if ConEd's attorney called Marc Hayworth, the scientist that allegedly tested the split specimen, to testify he would have said the flame chromatography test was done on the split specimen sample and the numerical values were the same for both tests.

163.   The Petitioner wanted the scientist to testify but first questioned the Union attorney and asked how could the Arbitrator disregard a part of the CBA because the entirety of a specific clause in the CBA was not submitted into evidence before the arbitration hearing began but the Arbitrator is willing to allow ConEd to call another witness that wasn't previously scheduled.

164.   The Union business agent, immediately becoming defensive for Con Ed, made a comment that ConEd is different from the Petitioner, but the Union attorney interrupted and said they would call the Petitioner right back.

165.   When the Union attorney and business agent called the Petitioner back the attorney informed him that the Union just agreed that if Marc Hayworth, a certifying scientist that supposedly tested the split sample, was called as a

witness he would have testified to the fact that the split specimen sample underwent the flame chromatography test and the numerical values were almost identical but in exchange for this the Arbitrator was now allowing all the DOT regulations into evidence.

166.    The Arbitrator to be involved in some kind of trade off has to be considered at the very least extremely unprofessional and unethical.

167.    ConEd's attorney in ConEd's final written argument to the Arbitrator makes the same false statements about the numerical values of the split sample being identical to the primary sample when the split specimen is only tested for the presence of the drug.

168.    The stipulated offer of proof that Con Ed's attorney refers to in Con Ed's closing written argument was the Arbitrator allowing false statements into evidence as facts without the scientist, that didn't work at the split specimen laboratory like ConEd claimed, not having to testify and in return the Arbitrator claimed he was now allowing the Union to enter the entire CBA into evidence after saying he wasn't.

169.    In the end the Arbitrator disregarded the entire clause in the CBA Article X-Section 41(3) which dictates drug testing procedures should follow 49 CFR Part 40.

170.    The Union attorney also trading off the opportunity to cross examine the scientist that would have proved a lot of comments made by ConEd were false to have the entire CBA allowed into evidence when the entire CBA should have been in from the start is not a poor tactical decision by the Union but is just

another example of the Union allowing ConEd's attorney and the Arbitrator to do what they want even though it was the Petitioner that suffered.

171.   If the Arbitrator fulfilled his legal obligation and took into account the entire CBA and the DOT regulations the Arbitrator would have canceled the test and directed the Petitioner back to work.

172.   The Arbitrator even failed to list the provision as a relevant contract provision to be considered in deciding this case (Article X-Section 41)(3).

173.   The only contract provision the Arbitrator listed as a relevant contract provision to be considered in deciding the case was a provision that ConEd violated terminating the Petitioner.( Article XI-Section 43)

174.   ConEd's closing written argument submitted to the Arbitrator and written by ConEd's attorney Amy Gladstone is filled with at least 30 false statements.

175.   ConEd's attorney falsely states in ConEd's final written argument that the Petitioner tested positive three times for illegal drugs while employed by ConEd and this is false.

176.   The Petitioner had a problem with prescription opioid pills and tested positive two times for the substance one time in 2015 and then again in 2016. The Plaintiff went to a rehabilitation facility after each positive result and was grateful and is still grateful that ConEd afforded him that opportunity.

177.   ConEd's attorney also states that the Plaintiff was caught trying to cheat on a drug test. Ms. Gladstone was extremely irresponsible and unprofessional to write these false statements in the closing written  argument.

178.    Ms. Gladstone was aware of the circumstances surrounding the 2016 incident and remembers the Arbitrator, without even hearing the case, not upholding the termination. Ms. Gladstone also had to remember being scolded by the Arbitrator for the evidence she submitted in 2016.

179.    The Con Edison representative that sent a written request to the NYSDOL to protest the Petitioner receiving unemployment benefits was able to more accurately explain Petitioner's past drug violations in the written request but Ms. Gladstone wasn't. (See Exhibit GG - Con Edison's request for a hearing).

180.    Ms.Gladstone painted a darker image of Petitioner's past drug use in hopes of making the Arbitrator think ConEd was dealing with a hopeless drug addict in an attempt to have the Arbitrator overlook the fatal flaws with the laboratory CCF and disregard an entire clause in the CBA.

181.    The Arbitrator then proceeded to neglect his legal responsibility and disregarded an entire clause in the CBA.

182.    Ms. Gladstone falsely claims that before the Petitioner's termination the MRO followed all the steps of verifying the Petitioner's split sample, besides signing the form, and "You learned that Dr. Moskowitz checked all the boxes required by the regulations, he timely reviewed the signed statement from the certifying scientist…"

183.    Con Edison's MRO did not have the laboratory CCF in his possession until five months after the Petitioner was terminated so the MRO could not have read the signed statement and ConEd's own evidence proves the MRO did not check

the one box on the MRO CCF regarding the split sample results until August 2, 2021.

184.    Every regulation and every safeguard regarding the reporting of the Petitioner's results was violated by Con Ed's MRO and the split specimen laboratory.

185.    Con Edison's attorney refers to a note allegedly written by a Con Edison representative that was created on April 13, 2021, from a conversation a Con Edison doctor reportedly had with a certifying scientist on February 22, 2021.

186.    The Con Edison doctor and the Con Edison representative were not part of the hearing in any way and the scientist didn't work at the split specimen laboratory as Con Edison claimed.

187.    Moreover, Con Edison's attorney quotes some of these statements from a note that was created by a person that wasn't part of the conversation. The person creating the note didn't quote any statements but Con Edison's attorney went ahead and "quoted" the statements.

188.    Article XI - section 49 (5) of the CBA states "The Arbitrator may choose, in his or her discretion, to accord little or no weight to hearsay evidence…". .

189.    This note is double hearsay evidence of a scientist that Con Edison falsely claimed worked at the split specimen laboratory and the Arbitrator writes four paragraphs on these hearsay notes.

190.    The Arbitrator disregarded all the DOT regulations, even the ones submitted into evidence in their  entirety. The only two comments made by the Arbitrator in his written award when referring to DOT regulations are two comments Con

Edison's attorney writes in Con Edison's closing argument. One statement is false and one is true.

191.    Regarding the hair follicle tests that the Petitioner submitted to, and that confirmed the absence of any of the substance that plaintiff was terminated for, Con Edison's attorney wrote "The procedures in the regulations allow only for testing of urine and do not allow for testing of hair."

192.    The Arbitrator wrote, "A review of the Part 40 Drug and Alcohol Testing Program (JX3) refers exclusively to urine testing. Nothing in the document makes any reference to hair follicle testing."

193.    The Arbitrator claimed to have reviewed the regulations to come across this one regulation (40.210) to discredit the hair follicle drug tests the Petitioner had done but the Arbitrator failed to come across any of the 16 different regulations that were violated by Con Edison's MRO and the laboratory.

194.    Con Edison's attorney is brazen enough to write in **bold letters "the regulations contain no time limitation for the MRO to formally sign off on the CCF form…".**

195.    Shockingly, the Arbitrator then falsely writes in his written award that "there is no time line provided for the sign off to be done."

196.    DOT regulations were not written to create doubt and have the integrity of the process called into question. The regulations were written to do the opposite.

197.    DOT regulations are considered the gold standard in drug testing procedures and DOT regulation 40.167 ( c ) states the MRO must transmit the fully

completed MRO copy of the CCF to the DER so the DER receives the form within two days of the MRO verifying and signing the MRO CCF.

198.   The Arbitrator states "...The delayed signature suggests a level of disorganization...that reflects poorly on the process itself and on the Company...When the sign off comes on the eve of an arbitration hearing, it casts doubt on the integrity of the contractual system of grievance arbitrations."

199.   He then rules to uphold that system.

200.   The ruling appears to be irrational on its face.

201.   Before the Arbitrator makes a statement to discredit the DOT regulations ("the process") he should have reviewed them. The Arbitrator not mentioning the laboratory copy of the CCF being produced on the eve of the arbitration hearing is the Arbitrator deliberately failing to acknowledge this fatal flaw.

202.   Throughout the regulations there are phrases such as "immediately", "same business day" and "ensure the timely flow of test results" all regarding the reporting of test results but somehow Con Edison's MRO, Con Edison's attorney and the Arbitrator all said the MRO can verify the laboratory results whenever the MRO feels up to it even if it's five months after an employee was terminated and only hours before an arbitration hearing.

203.   The MRO signing off on the eve of the arbitration hearing is a severe violation of the regulations especially when the date should have been in February of 2021, however, the Arbitrator intentionally fails to acknowledge or mention the Petitioner's biggest argument which was the split specimen laboratory failed to test the sample, as evidenced by the fact that they did not transmit a completed copy of the laboratory CCF to the MRO in February of 2021, which they were legally required to do.

204.    The Arbitrator disregarded this egregious and unforgiving flaw by ConEd's MRO and the laboratory because this was the violation that should have led to the Arbitrator canceling the test and directing the Petitioner back to work.

205.    The Arbitrator writes "The gravemen of the Grievant's argument is that the MRO signed off on the primary specimen on March 1, 2021, but did not sign off in the final step of the verification, Step 7, until August 2, 2021" makes it clear the Petitioner's testimony was not part of the evidence that was taking into consideration rendering the award.

206.    The Petitioner tried to explain in his testimony, but the arbitrator stopped him from offering unsolicited remarks and the Union attorney failed to pursue this line of questioning.

207.    Arbitrators usually hand down decisions within 30 days. On day 41 the Petitioner sent an email to the Union's attorney Micah Wissinger and asked when a decision was expected.

208.    The Union's attorney, instead of contacting the Arbitrator, contacted Con Edison's attorney to inquire about the decision and Con Edison's attorney informed the Union attorney that the Arbitrator's "computer broke" and it set him back two weeks. (See Exhibit II - emails from Petitioner to the Union attorney).

209.    The Arbitrator was courteous enough to inform Con Edison's attorney that there was a delay due to the fact his "computer broke" but the Arbitrator didn't think it was necessary to inform the Union's attorney of the delay.

210.    Article II - section 49(2) stating "Disputes concerning requests for records or other materials in a case may be presented to the Arbitrator, but always on notice to the other party, for resolution."

211.    The Arbitrator and the Union failed to rectify the situation and have Con Edison's MRO forward the Petitioner's Requests to the laboratories so the ~~Petitioner can review the "Litigation Packages".~~

212.    The Arbitrator, in his written award, failed to acknowledge or mention the laboratory's copy of the CCF that Con Edison "retrieved from the files" on the eve of the Arbitration hearing had a computer generated date of February 10, 2021, at the bottom of the form, along with an email address to a Quest database for CCFs and the specimen ID# for the Petitioner's sample.

213.    **Con Edison's attorney tampers with evidence at the beginning of the Arbitration hearing in order to hide the copy of the laboratory CCF that she submitted into evidence the day before.**

214.    Con Edison's attorney on the first day of the arbitration hearing claimed she was resubmitting the CCFs into evidence again so they could be resubmitted in a more "organized" way.

215.    Con Edison's attorney, on the day of the hearing (August 3, 2021), resubmitted the documents into evidence and the documents were labeled Co.5 (a)-(f).

216.    The Petitioner will only address the two copies of the laboratory CCFs that Ms. Gladstone resubmitted into evidence the day of the hearing. The two documents for this court are marked. (See KK) (See Exhibit KK(1) (See Exhibit KK(2).

217.    When the top of Exhibit KK is inspected and reviewed it becomes clear that the top of the form is missing. The stamp that laboratories place at the top of the

form when receiving and processing samples is not visible. The top of the form is copied over.

218.    The split specimen section is not filled in on this form. . (See - Exhibit KK).

219.    The second copy of the laboratory CCF that was resubmitted into evidence the day of the first hearing, August 3, 2021, was marked as C5(d) which is visible at the bottom right section of the form.  For this court the evidence is marked as KK(1).

220.    The two sections on this form that are designated for the primary specimen results and the split sample results are completely copied over and not visible on the form.

221.    The top right of this form has only one Quest Stamp on it from the laboratory in PA.  This copy of the laboratory CCF, with no primary or split sample section visible on the form was presented to Con Edison's MRO during his direct examination regarding the Petitioner's split sample being tested at the laboratory.

222.    Exhibit AA is a copy of the laboratory CCF that Con Edison produced on August 2, 2021. On the top of this form there are two Quest stamps visible and above one of the stamps it reads "Page 1 of 1" and "Fax this image" and at the bottom of the form is a computer generated date of February 10, 2021.

223.    The two copies of the laboratory CCFs that Con Edison's attorney resubmitted into evidence the day of the hearing (C5),(C5(d), were deliberately tampered with to prevent it being discovered that both (C5) and (C5(d) were the same form.

224.    Con Edison's attorney attempted to act like C5d was the complete laboratory

CCF (split specimen section completed) that was submitted into evidence the

day before.

225.    After Con Edison's attorney submitted the laboratory CCF into evidence on

the eve of the hearing she realized that it could be discovered that the split

specimen laboratory also transmitted the form to the MRO the day before the

hearing , on August 2, 2021, and she was falsely representing that ConEd was in

possession of it since February.

226.    The Arbitrator failed to acknowledge or mention that this form was the form

presented to the MRO during his direct testimony about the laboratory testing

Petitioner's split sample. This form was deliberately copied so the computer

generated date of February 10, 2021, would not be visible. This fact also went

unchallenged by the Union Attorney.

227.    The Arbitrator failed to mention the Petitioner's managers testimony who was

a witness for Con Edison but under cross examination stated that he "never saw

Mr. Joyce under the influence" and that "Mr. Joyce was an engaged employee"

and respected Shop Steward, who he would talk to when "policy changes were

being implemented in the department".

228.    The Arbitrator writes in his written award the test results "was memorialized in

an email to numerous Con Edison officials". The email should have been sent to

one Con Edison official, the DER, but instead the MRO reports Mr. Joyce's

unverified laboratory results to 8 Con Edison officials, multiple times.

229.   When the Arbitrator writes the MRO "memorialized" the Petitioner's private information to eight Con Edison officials he writes it as if the MRO did a good job and was following his responsibilities and requirements as an MRO..

230.   The Arbitrator who claimed to have reviewed the DOT regulations failed to come across the regulations that state the MRO must report results confidentiality and only to the DER.  (See 49 CFR 40.165)(a) (See 49 CFR 40.167)(a)(b).

231.   When the Petitioner's manager called Con Edison's MRO to inform the MRO that the Petitioner was a reliable worker and maybe there was a mistake with the test the MRO said that he couldn't speak on the issue because of privacy issues even know the Petitioner's manager was one of the 8 Con Edison officials the MRO included in the emails.

232.   Before the arbitration hearing the Petitioner sent an email to Union agent Steven Dauria and informed the Union agent that he wanted to request his performance reviews.

233.   The Petitioner's last two reviews were good and the Petitioner even received an excellent in communication.  The Union agent informed the Petitioner that the Union attorney already knew he wanted that requested. The reviews were never produced.

234.   On the last page of ConEd's final written argument Ms.Gladstone claims she submitted a 1987 arbitration award into evidence to support the Petitioner's termination in 2021 due to the fact the grievant from 1987 maintained that he did

not use cocaine despite clear test results. Again, the Union fails to challenge her false assertion.

235.    The grievant from the 1987 arbitration case admits to being dishonest and changing his story about his drug use, had a poor work record, and was placed on a final warning right before his termination. The grievant from 1987 also tested positive for cocaine three times in a little under a year.

236.    The Plaintiff now has maintained from the beginning that he has never used methamphetamine.

237.    The Plaintiff has never tested positive for methamphetamine.

238.    The Plaintiff also had an exemplary work record and was held in high regard by his managers and supervisors.

239.    Another difference between the two cases is The DOT regulations, split specimen testing and the critical safeguards in place to protect the accuracy and integrity of samples didn't exist in 1987.

240.    The 35 year old Arbitration award was submitted into evidence in a desperate attempt to have a ConEd's medical directors testimony from 1987 defend the two incomplete split specimen sections on the two critical CCFs.

241.    It should be noted that this arbitration took place before the DOT regulations were put in place to safeguard the process.

242.    The Arbitrator, from 1987, wrote "There is not any real dispute as to the test methodology and security procedures involved. Dr. Crane, Medical Director, Administration, explained the "Chain of Custody" in great detail.

243.    ConEd relying on the words of an Arbitrator from 1987 regarding testimony

from ConEd's medical director from 35 years ago sums up how Plaintiff's split

specimen sample was handled.

244.    The Union's failure to represent the Petitioner allowed ConEd representative's

to disregard the CBA, manipulate evidence, follow ConEd's procedures that

contain no safeguards for the handling of a specimen, lie under oath and then fill

a final written argument with at least 30 false statements.

245.    All the statements made in this petition are true and are supported by

accompanying documented evidence.

ROBERT JOYCE

X----------------------------------------------------------X
In the Matter of the Arbitration between

**CONSOLIDATED EDISON**
                    "Company"                            **ARBITRATOR'S**

        and                                   **OPINION & AWARD**

**UTILITY WORKERS UNION OF AMERICA,**
**LOCAL 1-2**                               **CASE # 16-T-21**
                   "Union"

e: Grievant Robert Joyce
X----------------------------------------------------------X
**BEFORE: ARTHUR A. RIEGEL, ESQ, ARBITRATOR**

**APPEARANCES:**
**FOR THE UNION:**
**LEVY RATNER by MICAH WISSINGER, ESQ.**
**STEVEN D'AURIA, BUSINESS AGENT, UWUA, LOCAL 1-2**
**ROBERT JOYCE, GRIEVANT**

**FOR CON ED:**
**AMY GLADSTONE, ESQ., LABOR RELATIONS ADMINISTRATOR**
**DR. JEFFREY MOSKOWITZ, CON ED MEDICAL REVIEW EXAMINER**
**GENE LATTANZI, SECTION MANAGER, WEST 28TH STREET FACILITY**

**BACKGROUND**

Pursuant to the collective bargaining agreement (CBA) between Con Ed (Company) and

Local 1-2 (Union) (Joint Exhibit [JX] 1), the undersigned was designated to hear and finally

determine the Union's claim that the Company terminated the Grievant's employment without

reasonable cause. Hearings on this matter were held on August 3 and 17, 2021.

The parties were represented by counsel and were given a full and fair opportunity to present

relevant documentary evidence and to conduct direct and cross examination of witnesses. The record

was closed after counsel for the parties submitted closing arguments. The parties agreed that the

1

issue to be resolved by the Arbitrator should be stated as follows:

> Did the Company have reasonable cause to terminate the Grievant, Robert Joyce?  If not, what shall the remedy be?

## RELEVANT CONTRACT PROVISIONS

### ARTICLE IX (JX1)

Section 43(1)
The right and power to select and hire all employees, to suspend, discipline, demote or discharge them for reasonable cause, to promote them to supervisory and other positions, to assign, supervise and direct all working forces, to maintain discipline and efficiency among them, and to exercise the other customary functions of the Management for the carrying on of the business and operations, are recognized as vested exclusively with the Company.  Such right and power shall not be exercised arbitrarily or unfairly as to any employee and shall not be exercised so as to violate any provision of this Contract.  No rule, procedure or practice of the Management shall be contrary to any provision of this Contract.

## FACTS

The Grievant, Employee No. 22095, has the title of Distribution Splicer. He is assigned to Manhattan Electric Construction. He has been employed by Con Ed since July 4, 2009.

On January 29, 2021, the Grievant failed a *urine drug test*.  He was interviewed by the Medical Review Officer (MRO) on February 8, 2021.  At that time, the Grievant denied using the substance found in the urine specimen tested in the laboratory.

The Grievant requested the examination of a *split sample.  The laboratory was complied with the request on February 17, 2021. The examination of the *split sample* confirmed the initial findings.

2

The Grievant continued to deny using the substance found in the initial testing.

The Grievant was summoned to an *Employee Interview* on March 5, 2021. As an outgrowth of the *Employee Interview,* the Grievant was discharged (CX4b).

The Union filed a grievance on behalf of the Grievant on March 24, 2021. It demanded the arbitration of the discharge (JX2). The instant proceeding was convened to adjudicate the grievance.

## POSITIONS OF THE PARTIES

### CONTENTIONS OF THE COMPANY

The Company argued as follows:

It has established that the termination of the Grievant was reasonable. Thus, the grievance should be denied in its entirety.

The Grievant has a lengthy disciplinary history of drug abuse. He was given two opportunities to complete rehabilitation after testing positive for the use of illegal opioids. He then tested positive for illegal drugs during an *on-call* test. As a consequence, he was placed on a Final Warning (FW) for substance abuse violations in June 29, 2016.

On July 15, 2016, the Grievant attempted to substitute a different urine sample for his at an *on-call* test. As a result, his employment was terminated.

On October 31, 2016, the Grievant entered into a *Last Chance Agreement* (LCA) that converted his dismissal to a resignation that allowed him to be re-hired after meeting all of the established pre-requisites. The LCA stated that future violations of the Company's Drug and Alcohol Testing procedures would result in his discharge. The LCA also stated that a dismissal for further violation of the testing procedures would require the Company to prove the misconduct and that the arbitrator would no authority to modify the dismissal.

3

The current matter concerns a January 29, 2021 *on-call* test. The Grievant produced a urine sample that tested positive for methamphetamines. He was advised of the finding by Dr. Moskowitz, the Medical review Officer (MRO). The Grievant denied that he ingested the illegal substance and requested that his *split sample* be tested at a different lab.

The Grievant's request was granted. The *split sample* was tested at a different lab and in a different location on February 17, 2021. The results of the second analysis were almost identical to the first one. Following the January 29, 2021 test results, the MRO placed the Grievant in an *off duty* status pending the results of the *split sample* test.

The Company acknowledges that there was some confusion concerning the chain of custody documents. However, there can be no doubt that a review of the documents shows that all of the documents were completed and signed in complete accordance with the regulations.

While there may have been delays in the sign-off process, the delays cannot be described as *fatal flaws* that would result in discarding the test results. Although the documents must be signed, there are no time limits for the signing of the chain of custody documents. There is no doubt that the MRO did ultimately sign the documents and, in so doing, complied with the requirements of the regulations.

The Union argued that the Grievant's self-ordered hair test taken well after the January 29, 2021 test should have been considered by the MRO. The Grievant asserted that the hair test results should trump the urine test.

The MRO disagreed that a self-ordered test performed by an entity unknown to the Company should have been considered. He noted that hair tests are never appropriately used to test for the presence of amphetamines and methamphetamines. Further, the CBA requires the following of the

4

regulations which require urine testing, not hair testing. In addition, the CBA precludes the use of labs other than those designated by the Company unless the MRO authorizes the use of such a lab. In this case, neither the Company not the MRO authorized the use of the hair test. Therefore, the hair test results could not be considered.

The Union did not rely on a physician or a scientist who specializes in Occupational Health. It relied on the testimony of the Grievant's local pharmacist, Jeff Rucker. Rucker's testimony was speculative. He admitted that he could not be sure that there was a *false positive* in this case. He also agreed that the Grievant could have ingested methamphetamines by taking an over the counter testosterone booster that could have resulted to a positive finding of the drug.

However, the MRO observed that there could not have been a false positive. He stated that the lab uses a *Flame Chromotography Test* every time there is a positive finding for illegal substances. He explained that the tested sample is burnt with the present illegal substance producing a distinct color. Rucker was vaguely familiar with this test and was unaware that this test rules out false positives. Further, the parties stipulated that, if the lab's certifying scientist testified, he would confirm that the *Flame Chromotography Test* was used in this case.

The role of the Arbitrator is to determine if the Grievant's urine sample contained methamphetamines. If such a determination is made, there must a finding that the Grievant violated the company's drug and alcohol policy. If such a finding is made, the Arbitrator must find that the LCA was violated. The consequence of such a violation must result in the Grievant's dismissal.

Under these circumstances the Company is well within its rights to discharge the Grievant without offering him further treatment options. The Grievant remains in denial as to his problem.

These facts, in conjunction with the violation of the LCA, require a finding that the Company

5

had sufficient and reasonable cause to terminate the Grievant's services with the Company. Therefore, the grievance should be denied.

## CONTENTIONS OF THE UNION

The Union argued as follows:

A grievance was filed on the Grievant's behalf because the Company indicated that he violated its chemical abuse substance policy and must be terminated under the terms of the LCA. However, the Company did not prove that he violated the policy. It did not prove that he used illegal or unauthorized drugs and did not prove that he was under the influence of drugs while on duty.

The Grievant never took the illicit drug that he was accused of taking. He submitted to multiple drug tests that looked back further in time than the January 29, 2021 test.

There are explanations for a positive test result despite the employee not having ingested the illicit substance. The MRO and the Grievant's pharmacist testified that unregulated and undisclosed substances in over the counter supplements can contain substances that may produce a positive test result for methamphetamines. Rucker, the Grievant's pharmacist, testified that the Grievant's prescription for Adderall could have metabolized with an over the counter supplement to produce the positive test result.

There are some unknowns about how the Grievant tested positive for methamphetamines. However, it is clear that the Grievant ingests Adderall, a drug in the same family as methamphetamine. It is also apparent that in the weeks prior to January 29, 2021, he began taking a testosterone supplement. Finally, he took three follicle tests that came back negative for illicit drug use.

Moreover, the Company failed to verify and process the January 29, 2021 urine test. The

6

CBA requires the Company to test employees pursuant to Department of Transportation (DOT) regulations. These regulations spell out in great detail which procedures must be followed when alcohol/drug tests are administered.

In this regard, the Grievant cites the following DOT regulations: 40.123, 40.129, 40.199, 40.123, 40.203, and 40.205.   The instant test should have been cancelled or corrected. According to DOT Regulation 40.207, a cancelled test is considered neither positive nor negative.

Since the Grievant knew that he did not take methamphetamines, he immediately requested information about the test in order to understand what happened and how to prove his innocence. The Company stonewalled the request and, it was not until August 2, 2021 that the Union and the Grievant finally received the Chain of Custody form (CCF).

The CCF is supposed to tell a *story*. The MRO is supposed to ensure the integrity of the form. In this case, the story was incomplete until August 2, 2021 and the MRO states that it is acceptable to misplace forms and complete them later.

The Grievant states that a portion of the CCF found on August 2, 2021 appears to have been printed on February 10, 2021 and signed on February 17, 2021. The report shows that the *split lab* did not receive the urine specimen until February 17, 2021.  The form is supposed to stay with the sample.  There are serious questions about how the CCF has a computer print date of February 10, 2021.

Under DOT Regulation 40.163, the receipt of lab results is not enough to terminate or remove someone from a safety sensitive position.  The MRO must use a signed or stamped and legibly dated copy of Copy 2 of the CCF to report test results or provide a written report/letter.  Moreover, the Company must complete all steps of the verification process. The MRO must have the CCF in hand

7

and must verify it. It is his duty to verify that all signatures are accounted for and that the process has been completed correctly. The MRO acknowledged that the DOT process is not complete until the MRO signs off.

As indicated by the Grievant's testimony, there was a *fatal flaw* under the DOT regulations that required the cancellation of the January 29, 2021 test. Even if one does not find the presence of a *fatal flaw*, the Company was grossly incompetent in the processing of this case or was hiding something. Regardless, the termination cannot stand.

The Company was dismissive throughout the hearing. It dismissed evidence that there are explanations for a false positive. It dismissed multiple test results. It dismissed requests for information so the Grievant could prove he tested positive for a drug he did not take. Finally, it was dismissive of the CBA and the DOT Regulations such that there was no signature on the paperwork to technically fire the Grievant until the day before the arbitration.

When presenting its case in chief, the Company did not present a full set of CCF forms. While it is understood that working remotely is challenging, the Union expects better when an employee's livelihood is on the line. It was only through cross-examination that the MRO reviewed the forms turned over to the Union on August 2, 2021.

On direct examination, the MRO did not testify as to when he verified the test. He noted that the *lab* verified it. There is no evidence that the MRO ever verified the test result. The Company indicated that *verification* did not require the MRO to complete paperwork when he performed his verification. It untenably argues that the verification can happen at any time and still conform with DOE Regulations. This is not true,

The CBA requires the Company to follow of DOT Regulations. The Union and the

8

employees are entitled to more than the misplacing of forms and the verification of test result on some unknown date.

The Company wants to rely on the LCA . Even under the LCA, the Company must fully and effectively effectuate the process. In this case, the MRO signed the paperwork to complete the verification process five months after the employee was discharged.

The Company's argument boils down to two issues. First, there was nothing wrong with misplacing CCF documents and completing it later. Second, employees can unknowingly ingest an illicit substance and still be guilty of violating the Chemical Substance Abuse Policy.

The Company did not prove that the Grievant violated the substance abuse policy and did not properly effectuate his discharge under the policy. Therefore, the grievance must be sustained.

## OPINION

After reviewing the documentary and testimonial evidence, the undersigned concludes that the grievance filed on behalf of the Grievant must be denied.

There are two elements to this case. The first deals with the objective data relative to whether the Grievant tested positive for methamphetamines on January 29, 2021. The second aspect of this case relates to the question of whether the Company violated DOT Regulations during the testing process and, if so, whether the results of the January 29, 2021 should be cancelled. Each of this issues will be dealt with separately.

**The objective data**

It is unrebutted that the Grievant was summoned to an *on call* drug test on January 29, 2021. He appeared and provided a urine sample. The sample was analyzed and, in a report dated February 6, 2021, the Grievant was found to have tested positive for amphetamines and methamphetamines

9

(Company Exhibit [CX[ 5c).

The record indicates that the MRO, Dr. Moskowitz, interviewed the Grievant on February 8, 2021 and advised him of the results of the January 29, 2021 drug test. The MRO stressed that the Grievant denied ingesting the *substance confirmed positive in his specimen by the laboratory*. The MRO added that there was no alternative explanation for the test results.

The MRO noted that the Grievant requested a test of the *split sample*. He stated that the split sample test had been arranged. The content of the February 8, 2021 interview was memorialized in an email to numerous Con Ed officials.

In a February 22, 2021 email to the same people *copied* on the February 8, 2021, the MRO reported that the split sample test re-confirmed the presence of the substance identified in the original drug test.

In both emails, the MRO found, pursuant to Corporate Instruction on Drug and Alcohol Testing (560-4), the Grievant unfit for duty. The MRO referred the matter back to the department and indicated that treatment had not been offered (CX6).

The Drug Testing and Control Form (CCF) indicates that the split sample analysis re-confirmed the presence of methamphetamines (CX5e). Further, in a Progress Note dated April 13, 2021, there is a notation dated February 22, 2021 and an entry that indicates a *Re-test performed on the 1/29 sample-received at lab 2/11 and reported as reconfirmed on 2/17*. (CX7a).

In addition, in a Progress Note dated April 13, 2021, Dr. Stephanie Barnhart, the Company's Medical Director, noted that she contacted Marc Hayworth, a Certifying Scientist at the testing lab, and inquired as to whether there was any legitimate explanation for the lab results or if there is additional testing that could be performed on the sample. She noted that he indicated that the *d-*

10

*isomer* was at a dangerous level and represented illicit methamphetamine use. She added that Dr. Hayworth observed that, given that the original results were re-confirmed the original results, it is unlikely that there is another valid explanation for the test results. Dr. Hayworth stated that a prescription for amphetamine salts, a substance that the Grievant claimed to have ingested, would not have produced the results in this case (CX7a).

The final statement of Dr. Hayworth is relevant in this case. The Grievant alleged that an over the counter testosterone booster could have caused the January 29, 2021 test results. This matter will be the source of further comment below.

The possibility of a *false positive* result was raised during the hearing. The Grievant's pharmacist, Mr. Rucker, posited that the results of the January 29, 2021 could have been a *false positive.*

The MRO indicated that, whenever there is a positive result for an illicit drug, the laboratory conducts a *Flame Chromotography Test.* Said test involves the burning of the urine specimen. The process produces various colors that are specific to the drug being tested, in this case methamphetamines. The MRO observed that the *Flame Chromotography Test* rules out the possibility of a *false positive.* The parties agreed that, if called to testify, Dr. Hayworth would state that the lab performed a *Flame Chromotography Test* on the Grievant's urine specimen.

The remaining subject to be discussed is the *hair follicle testing* that was done at the Grievant's request. It is a fact that the Grievant submitted two forms indicating negative results on the hair follicle tests (Union Exhibit [UX] 1 & 2).

The question is how much weight should be afforded to these documents. For a number of reasons the results of the hair follicle tests can be given no weight.

11

The CBA indicates that the drug/alcohol testing is to be done in conformance with CFR Part 40. A review of the Part 40 Drug and Alcohol Testing Program (JX3) refers exclusively to urine testing. Nothing in the document makes any reference to hair follicle testing.

Further, Company Policy 560–4 (Item 4.2) states that *Test results from vendors other than those designated by the Company will not be used unless directed by the MRO or other designee assigned by the Company.* The instant tests were conducted by a Company selected lab and neither the Company nor the MRO authorized the hair follicle tests.

Finally, the Grievant submitted the hair follicle test results with no supporting evidence that the hair samples were even his own. Moreover, there was no CCF for either form.

Therefore, for the reasons stated above, the hair follicle test results cannot be considered.

The balance of the evidence persuades the undersigned that the objective evidence supports a finding that the results of the January 29, 2021 urine test were valid. It was confirmed by the split sample test. Finally, the lab's certifying scientist made it clear that it is unlikely that there could be an explanation of the January 29 , 2021 findings other than the results of the analysis.

The Grievant produced his local pharmacist, Mr. Rucker, as a witness for his defense. Before addressing the content of his testimony, it must be stated at the outset that Mr. Rucker is not an expert in the area of drug testing. As such, his testimony can, at most, be given minimal weight.

The above comment is increasingly relevant in the context of his testimony. Most of his testimony was speculative. He suggested that drugs *can* interact with each other and *may* cause a positive test result.

~~Rucker claimed to have a vague knowledge of *Flame Chromotography* but did not know that~~ it is used to rule out *false positive* results. Immediately before being questioned about *Flame*

12

*Chromotography,* he posited that a *false positive* was possible in this case. In the absence of this knowledge, the speculative testimony he offered about a *false positive* was of very minimal value.

This is not to say that Mr. Rucker is not a competent pharmacist. He may well be but the testimony he offered in support of the Grievant was entirely unpersuasive.

In short, the objective data supports a finding that the Grievant violated Company Policy 560–4 (approved in August 20, 2020) by testing positive for the presence of amphetamines and methamphetamines in his urine sample.

The defenses offered concerning hair follicle testing and the testimony offered by Mr. Rucker were unavailing.

**Were the DOT Regulations violated?**

The Grievant strenuously argued that the MRO did not properly complete the verification process relative to the testing. He stressed that the MRO must make sure that all of the signatures are in place and that the process has been correctly completed. He added that the MRO needs to correct any errors and needs to sign off on the form.

The form under consideration is Copy 2 of the CCF (CX5b). The undersigned has reviewed the form and finds that Steps 1-5 of the form were correctly filled out. Step 6 indicates that the Grievant tested positive for methamphetamines and Step 7 indicates that the split specimen reconfirmed the positive finding of methamphetamines.

The gravamen of the Grievant's argument is that the MRO signed off on the primary specimen on March 1, 2021 but did not sign off in the final step of the verification, Step 7, until August 2, 2021. He suggested that the delay in the signing was a fatal flaw in the process that should result in the cancellation of the process.

13

While the DOT Regulations requires the MRO to verify the results of the process and to sign off on the bottom line of the CCF, there is no time line provided for the sign off to be done. Thus, there cannot be a finding of a fatal flaw since there was no violation of the Regulation.

However, it is understandable that the Grievant would object to the final signature not being affixed until five months had passed since the MRO received the results of the split sample. What is further troubling is that the CCF sign off came on the eve of the first arbitration date of this matter.

The delayed signature suggests a level of disorganization in the Drug and Alcohol Testing Program that reflects poorly on the process itself and on the Company. Moreover, when the sign off comes on the eve of an arbitration hearing, it casts doubt on the integrity of the contractual system of grievance arbitrations.

While the Arbitrator encourages a review of the above observations, as a matter of law and regulations, there was no violation of the DOT Regulations. Therefore, the Grievant's argument must be rejected on its merits.

## CONCLUSIONS

The record indicates that the Grievant tested positive for methamphetamines on January 29, 2021. The results of the January 29, 2021 test were re-confirmed when the split sample was analyzed. Finally, the technology employed by the testing lab persuades the Arbitrator that the January 29, 2021 test result could not have been a false positive. In short, the Grievant violated the Company's Policy on Alcohol and Drug Testing.

All of the defenses raised by the Grievant must be rejected. That being said, it is necessary to comment about the representation given to the Grievant and the Company. All of the arguments made were zealous, serious and thoughtful and the atmosphere created was appropriate and

14

professional.  However, given the quality and quantity of objective data in the record, counsel for the Union and the Grievant could not prevail.

The final phase of this decision deals with the penalty to be imposed.  It is a matter of record that the Grievant entered a LCA with the Company on October 26, 2016 (CX4c).

The LCA provided for the rehiring of the Grievant after he had been terminated.  The original termination was converted to a resignation and, following the resignation and the Company rehired the Grievant. The pre-requisites of the rehire are set forth in the LCA and need not be set forth here.

However, the pertinent part of the LCA is the Last Chance Final Warning. The relevant terms are as follows: *Additionally, if the employee is disciplined and/or terminated for breaching any of the terms set forth in this Agreement, the Company need only prove that the employee violated a condition of this Agreement.  The Arbitrator will have no authority to modify the discipline imposed by the Company if he/she finds the Employee guilty of the alleged misconduct.*  Accordingly, the terms of the LCA render an analysis of the Grievant's misconduct prior to the LCA unnecessary. Further, given the terms of the LCA, it is unnecessary to discuss the various rehabilitation opportunities provided to the Grievant

In this case, the Arbitrator finds that the Grievant violated the Company's policy on Alcohol and Drug Testing on January 29, 2021 when he tested positive for methamphetamines.  A violation of said policy is explicitly set forth in the LCA.  Therefore, under the terms of the LCA, the undersigned is without authority to modify the penalty, termination, imposed by the Company.

Thus, based in the above, the undersigned makes the following:

## **AWARD**

1. The grievance is denied.
2. The Grievant's services with the Company shall be terminated.

Hewlett, NY
September 30, 2021

ARTHUR A. RIEGEL, ESQ.
ARBITRATOR

## **AFFIRMATION**

STATE OF NEW YORK)
COUNTY OF NEW YORK )

    I, Arthur A. Riegel, Esq., affirm that I am the individual described in and who executed the foregoing instrument which is my Opinion and Award.

ARTHUR A. RIEGEL, ESQ.

adulterated tests and other refusals to test. We have done so.

Another commenter raised the issue of a different kind of legal proceeding. The commenter asked whether otherwise confidential information could be released in a personal injury lawsuit where the employee's conduct was an issue (e.g., a truck or bus driver involved in a collision). We believe that, if a court orders the production of such information because it is relevant in such a proceeding, it is reasonable for the employer to provide it without getting the employee's consent. In this situation, the requirements of justice in the litigation outweigh the employee's privacy interest. We have added a paragraph to this effect. We also added a paragraph telling a service agent who is holding this information to provide it to the employer when the employer requests it for use in a legal proceeding covered by this section.

*Section 40.327   When Must the MRO Report Medical Information Gathered in the Verification Process?*

This section provides that, under certain circumstances, MROs must provide certain otherwise confidential information to employers and certain other parties. The purpose of providing this information is to enhance safety. Commenters had a variety of concerns about this section. One comment suggested that the medical information be provided in writing in all cases. We think that a prudent MRO may choose to do so, but we do not believe that a regulatory requirement is needed.

Some commenters objected to the paragraph that allows MROs to consult with the employee's own physician to see if alternate medication might be available that would be less likely to adversely affect safety, saying that MROs should stay out of what looks like a doctor-patient relationship with employees. A few commenters supported this proposal. Under the proposal, the MRO would take this step only with the employee's consent, and for the purpose of helping the employee find medication that would be compatible with safe job performance. From both the point of view of employee interests and safety, we believe that this proposal is sound, and we have retained it.

One commenter said that Canadian law would preclude a doctor from releasing this information to an employer. We have added a provision saying that if the law of a foreign country, such as Canada, prohibits MROs from providing medical information to the employer, the MROs may comply with that prohibition.

Another commenter pointed out that not only physicians, but also other medical professionals, may make determinations about whether an employee meets physical qualification standards. We have adopted the commenter's suggestion that the MRO can release information to the "health care provider" involved in this activity. Consistent with the SAP provisions of the rule, we have included SAPs who are evaluating employees as part of the return-to-duty process as a party to whom the MRO can provide information under this section.

Finally, as some commenters requested, we have made it mandatory for MROs to release information under this section if the information is likely to result in the employee being medically unqualified for performance of safety-sensitive duties under a DOT regulation or if the information indicates that continued performance by the employee of his or her safety-sensitive function is likely to pose a significant safety risk. In this case, the Department believes that the safety interest served by the information release outweighs the confidentiality interest of the employee.

We point out that the medical information described in this section cannot be transmitted to employers or other parties using a C/TPA or other service agent as an intermediary. MROs must transmit this information directly to the employer.

*Section 40.329   What Information Must Laboratories and Other Service Agents Release to Employees?*

Proposed § 40.329, concerning release of information by MROs to third-party employers, has been deleted, for the reasons given in the "Principal Policy Issues" section of the preamble. This section is based on proposed § 40.331 of the NPRM.

One commenter requested that the Department require that laboratories provide all records requested by an employee, as well as a laboratory person to testify in a legal proceeding who has firsthand knowledge of the laboratory, its records, and operating procedures. This commenter also requested that the rule require the laboratory to make records available within 10 days, rather than waiting for payment from the employee. This section does require that laboratories and other service agents provide a "data package" (sometimes referred to as a "litigation package") upon the employee's request. We do require that they provide it within 10 business days. The rule also limits the charge the service agent can make for the cost of copying and preparation. We

believe these provisions adequately protect employee interests. We do not believe it is necessary, as another commenter suggested, to list the contents of a litigation package, which is quite standard and well understood among laboratories.

We have not adopted the suggestion that laboratories be required to produce witnesses for appearances at legal proceedings. Such an open-ended requirement would impose, in our view, unnecessary costs and burdens on laboratories and other service agents. There are adequate means (e.g., documentary evidence) through which employees can raise issues about the testing process.

The NPRM proposed that laboratories provide to employees, on written request, information relating to the results of relevant HHS certification reviews. One comment supported this proposal, which is consistent with long-standing DOT interpretation of the existing Part 40, while another commenter proposed that the laboratory's obligation be limited to the latest HHS **Federal Register** notice listing the laboratory as certified. Based on conversations with HHS staff, we have decided to delete this provision. HHS staff believe that providing this information would unnecessarily intrude on the HHS-laboratory relationship and could result in the introduction of misleading information about the laboratory certification process in legal proceedings involving drug test results.

*Section 40.331   To What Additional Parties Must Employers and Service Agents Release Information?*

This section is based on § 40.333 of the NPRM. Some commenters objected to being required to permit DOT representatives to see a broad array of drug and alcohol testing information. DOT has significant safety responsibilities for transportation industries, of which our drug and alcohol testing rules are an important part. As part of its safety mandate, DOT must be able to inspect regulated employers and those who carry out their drug and alcohol testing program responsibilities. DOT cannot do this job unless we have access to all relevant information. We believe it is vital to maintain this provision in the final rule. We would point out, particularly in response to a comment that Canadian MROs could not legally release certain information, that this paragraph focuses on the inspection and review of documents as part of the DOT oversight process, not on release of information to third parties.

 Gmail

Robert J <rj41926@gmail.com>

## Robert Joyce/22095

**Robert J** <rj41926@gmail.com>
To: MedicalRecords@coned.com

Thu, Mar 11, 2021 at 3:08 PM



**conEdison**

**Employee Wellness Center**
4 Irving Place, New York, NY 10003 - 11th Floor North

## AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS

I, _Robert Joyce_                    _22095_
        **Employee Name**                    **Employee No.**

Authorize Con Edison's Occupational Health Department to release the records described
below to the persons or organizations described below for the purposes described below:

The information that may be released is the following:

Shipping details (tracking #'s), storage details, testing procedures. The results
from both labs. The test results from the second lab. Specimen # 1266-4572
                                                                    Specimen collected 1/29/21

Person or organization to whom records are to be released:

_Robert Joyce_                    (917) 576-9269
Name                                Phone #

_541 Westfield Dr_    _Valley Cottage_    _NY_    _10989_
Address                    City            State    Zip



Robert J <rj41926@gmail.com>

## Robert Joyce/22095

**Robert J** <rj41926@gmail.com>                                    Wed, Mar 17, 2021 at 11:16 AM
To: MedicalRecords@coned.com



 Gmail

Robert J <rj41926@gmail.com>

## Robert Joyce/22095

**Robert J** <rj41926@gmail.com>                                              Tue, Mar 30, 2021 at 12:34 PM
To: "Moskowitz, Jeffrey P." <moskowitzje@coned.com>

Doctor Moskowitz,  I emailed  over two Authorization medical release forms for medical information like you said to do.  I
sent one on March 11 and one on March 17 and as of today I still did not receive it. Thanks. Robert Joyce/ 917 576 9289

 Gmail

Robert J <rj41926@gmail.com>

## Robert Joyce

**Robert J** <rj41926@gmail.com>                                              Wed, Apr 7, 2021 at 12:03 AM
To: "Moskowitz, Jeffrey P." <moskowitzje@coned.com>



**Employee Wellness Center**
4 Irving Place, New York, NY 10003 - 11th Floor North

## AUTHORIZATION FOR RELEASE OF MEDICAL RECORDS

I, _Robert Joyce_ _22095_
   Employee Name          Employee No.

Authorize Con Edison's Occupational Health Department to release the records described below to the persons or organizations described below for the purposes described below.

The information that may be released is the following:

_Shipping details (tracking #'s), storage details, testing procedures, the results from both labs. The test results from the second lab_

Persons or organizations to whom records are to be released:

_Robert Joyce_ _(917) 576-9___
                                    Phone

___ Yorktown, NY 1098___

Doctor Moskowitz, This was the authorization form I emailed to medical records on March 11. I sent you an email last

week regarding this.  Hopefully  I receive the information soon. If there is anything I can do to help get the information I requested  please let me know.  Thank you.  Robert Joyce 917 576 9289

 Gmail

Robert J <rj41926@gmail.com>

## Robert Joyce/22095

**Robert J** <rj41926@gmail.com>                                        Tue, Apr 20, 2021 at 5:08 AM
To: "Moskowitz, Jeffrey P." <moskowitzje@coned.com>

Dr.Moskowitz, I am requesting the laboratory results, data packages, shipping details (tracking #'s) and all documents
from Quest Diagnostics in Norristown PA and Quest Diagnostic In Georgia for specimen ID: 0684573. Thank you.

Robert Joyce

9175769289

 Gmail

Robert J <rj41926@gmail.com>

## Robert Joyce/22095

**Robert J** <rj41926@gmail.com>                                                      Wed, Apr 21, 2021 at 9:35 AM
To: "MedicalRecords@coned.com" <MedicalRecords@coned.com>



 Gmail

Robert J <rj41926@gmail.com>

## Robert Joyce/22095

**Robert J** <rj41926@gmail.com>
To: "Moskowitz, Jeffrey P." <moskowitzje@coned.com>

Thu, May 6, 2021 at 12:32 PM

Dr.Moskowitz, I am requesting all original laboratory results, data packages, shipping details (tracking numbers) and any and all original laboratory documents from Quest Diagnostic in Norristown PA and Quest Diagnostic in Tucker GA in regards to specimen ID# 0684573. Thank you.

Robert Joyce 917 576-9289

 Gmail

Robert J <rj41926@gmail.com>

## Arbitration

**Steven Dauria** <Steven.Dauria@uwua1-2.org>                    Thu, May 13, 2021 at 7:14 AM
To: Robert J <rj41926@gmail.com>
Cc: Frank Morales <frank.morales@uwua1-2.org>

Robert,

We have spoken after March 30th many times. We have explained the process, we also explained that a union attorney will talk to you if they approve to go forward and review your case with you. Again I also told you on 5/6 that what you request and what I request are different.  What you request from the company you have to handle with you and the company.
You also said you were going to send another request to the company on your own. I said that was between you and the company.

 Last Thursday 5/6 I went through the whole process with you again, and explained it again to you.

Grievance committee will review and let me know the outcome of their decision. Once I receive the decision I will notify you.

Thank you,



Steven D'Auria
U.W.U.A. A.F.L.-C.I.O. Local 1-2
Business Agent
5 West 37st 7th floor
New York, N.Y. 10018

**From:** Robert J <rj41926@gmail.com>
**Sent:** Thursday, May 13, 2021 6:27:45 AM
**To:** Steven Dauria <Steven.Dauria@uwua1-2.org>
**Subject:** Re: Arbitration

[Quoted text hidden]



# Corporate Instruction

conEdison

| SUBJECT |
|---|
| **DRUG AND ALCOHOL TESTING** |

**1.0** **PURPOSE** -- To set forth the Company's drug and alcohol testing practices and procedures.

**2.0** **APPLICATION** -- This Instruction applies to all employees of Consolidated Edison Company of New York, Inc. (CECONY) and all applicants for employment with the Company. The terms *Corporate* and *Company* when used in this Instruction refer to CECONY, unless otherwise stated.

**3.0** **DEFINITIONS** --

**3.1** **Alcohol** – The intoxicating agent in beverage alcohol, ethyl alcohol (i.e., grain alcohol, distilled spirits, etc.), or other low-molecular weight alcohol.

**3.2** **Chain of Custody Form (CCF)** – The form used in the Company's chain of custody procedure for handling urine specimens.

**3.3** **Chemical Substance Abuse (CSA) Counselor** – A person designated by the Company to evaluate employees who may have violated the provisions of this Instruction or who request substance abuse counseling or treatment.

**3.4** **Collector** – The person who instructs and assists employees and job applicants at the collection site, receives and makes an initial inspection of the specimen provided by the employee or job applicant, and initiates and completes the CCF.

**3.5** **Departmental Employment Representative (DER)** – An employee who is authorized by the Company to take immediate action to remove or cause to be removed employees from their assigned duties and perform other responsibilities under this Instruction. DER contact information can be found in Wellness Programs.

**3.6** **Drugs** – The drugs for which tests are conducted by the Company under this Instruction, which include amphetamines, narcotics, opioids, hallucinogenic substances such as PCP and marijuana, stimulants such as cocaine, and other habit-forming drugs. The Company may also test for other drugs as directed by the Medical Review Officer (MRO).

**3.7** **Medical Review Officer (MRO)** – A licensed physician who receives and reviews drug testing laboratory results and evaluates possible medical explanations for certain results.

**3.8** **Physician** – A person licensed to practice medicine in the jurisdiction where

| APPROVED | APPROVED DATE | LAST REVIEWED DATE | NUMBER | SUPERSEDES | PAGE | **1** | OF |
|---|---|---|---|---|---|---|---|
| **Mary Kelly** | **Aug 20, 2020** | **Aug 20, 2020** | **CI-560-4** | **Jun 11, '20** | | **8** | PAGES |

Case 1:22-CV-00801-AT-JLC

| SUBJECT |
| --- |
| **DRUG AND ALCOHOL TESTING** |

such services are performed, or any other person whose services, according to applicable law, are treated as physician's services.

3.9    ~~**Safety-Sensitive Position** – A position that involves working with live electric,~~ gas, steam equipment, or machinery that could cause property damage or a hazard to individuals or the public; driving a Company vehicle or personal vehicle in the course of employment for the Company; or work that otherwise involves the health or safety of the employee or others.

## 4.0    GENERAL PROVISIONS --

4.1    Company employees are prohibited from using illegal drugs or engaging in the illegal or unauthorized use of drugs at any time.  Company employees are also prohibited from being under the influence of drugs or alcohol while on duty.

4.2    Testing and related services may be conducted by Employee Wellness Center personnel or by outside vendors approved and designated by the Company. Test results from vendors other than those designated by the Company will not be used unless directed by the MRO or other designee assigned by the Company.

4.3    Direct observation testing will be conducted in accordance with this Instruction and the <u>Alcohol and Drug Testing Policy Direct Observation Protocol</u>.

4.4    All Company employees and job applicants are required to comply with this Instruction.  Failure to comply may result in disciplinary action or denial of employment.

## 5.0    PROCEDURES --

5.1    **Drug and Alcohol Tests** – Under this Instruction the Company administers the types of drug and alcohol tests described in paragraphs 5.2 through 5.7.

5.2    **Pre-employment Testing** – Pre-employment drug testing applies to job applicants who receive a conditional offer of employment.  An applicant will not be employed by the Company unless and until the Company receives a verified negative test result from the MRO.  Any applicant with a verified positive test result will be denied employment. The Company does not test applicants for marijuana unless the applicant is applying for a position regulated by the U.S. Department of Transportion.

5.3    **Random Drug and Alcohol Testing** – All Company employees are subject to random drug and alcohol testing under this Instruction.

a.    <u>Selection of Employees for Random Testing</u>.  Random tests are unannounced and testing dates are scheduled throughout the calendar year. Employees are selected for testing by a scientifically valid method designed


conEdison

Case 1:22-CV-00801-AT-JLC

SUBJECT

**DRUG AND ALCOHOL TESTING**

to randomly select employees' Company ID numbers. Each employee in the testing pool has an equal chance of being tested every time a selection is made.

b. <u>Notification of Employees for Testing</u>. Supervisors and managers will not provide advance notice to an employee of his/her selection for random testing. Notification is provided to the employee's supervisor on the day of the scheduled test or on Fridays for weekend testing. The supervisor must notify the employee of his or her test as soon as reasonably possible, on the day of the scheduled testing, unless the employee is absent from work or unavailable and the absence or unavailability is authorized as noted in c.(1) below. No employee is excused from testing for any reason other than an authorized absence or unavailability as determined by the employee's manager.

c. <u>Testing Protocols</u>. Each employee selected for testing must report to the test site as soon as reasonably possible after being notified and in no case later than the time period set forth in the written notice.

   (1)   In the event that an employee is selected for testing but is absent from work or unavailable and the absence or unavailability is authorized, which includes (but is not necessarily limited to) vacation, previously scheduled and approved off-site training, and sick absence, the employee will be excused.

   (2)   If an employee is excused from a random test for a valid reason, the employee must not be notified. For example, the employee must not be copied on any correspondence to the Employee Wellness Center regarding the employee's excusal. If the employee is notified, then he or she could be considered a "No-Show" (i.e., a refusal to test), pending review by the DER and the employee's department.

   (3)   Newly-hired employees may be placed in an accelerated random testing pool and selected for random drug and alcohol testing up to two times during their first three months of employment.

**5.4**   <u>**Post-Incident Testing**</u> –

a. Employees shall be subjected to post-incident testing under the following circumstances:

   (1)   The employee, while operating a Company vehicle or a non-Company vehicle on Company business, is involved in a collision that results in the immediate transportation of any individual to a hospital.



conEdison

| DATE | NUMBER | SUPERSEDES | PAGE | **3** | OF |
|------|--------|------------|------|-------|-----|
| **Aug 20, 2020** | **CI-560-4** | **Jun 11, '20** | **8** | | PAGES |

SUBJECT

**DRUG AND ALCOHOL TESTING**

    (2)    The employee sustains a work-related injury that requires hospitalization.

b.   Drug and alcohol testing should be conducted as soon as possible after the incident. In cases where an employee has been admitted for in-patient care, testing will be conducted by the treating medical facility. In the event that testing is not performed, the reasons shall be documented in the Safety and Health Information Management System (SHIMS).

c.   Following the incident, the employee must remain available for testing if possible but should not delay seeking medical attention for himself/herself or any injured person(s).

d.   The employee must not use alcohol for eight hours following the accident or until he or she undergoes post-accident alcohol testing, whichever occurs first.

e.   The employee's manager or supervisor will:

    (1)    For post-incident testing during regular business hours (7:30 a.m. to 4:30 p.m.), contact the Employee Wellness Center. For testing after regular business hours, arrange testing using the vendor listed in the <u>After Hours-Testing Protocol</u> on the HR intranet site.

    (2)    Remain with the employee at the incident site until testing at the site is completed; or, at the direction of the Employee Wellness Center, escort the employee to the closest testing site location and remain present until testing is completed.

    (3)    If a required alcohol test was not administered within two hours following the incident, prepare and maintain a file on record stating the reasons why the test was not timely administered. If the required test is not administered within eight hours following the incident, cease attempts to administer the test.

    (4)    Ensure that the required drug test is conducted within 32 hours following the incident. If the required test is not conducted within 32 hours following the incident, the reasons why the test was not timely administered shall be documented in SHIMS.

**5.5**    <u>**Reasonable Suspicion or Cause Testing**</u> –

a.   An employee is required to submit to a drug and/or alcohol test when a Company manager or supervisor has reasonable cause or suspicion to believe that the employee is under the influence of drugs and/or alcohol. The determination of reasonable cause or suspicion should be based on specific,



conEdison

| DATE | NUMBER | SUPERSEDES | PAGE | **4** | OF |
|------|--------|-----------|------|------|-----|
| **Aug 20, 2020** | **CI-560-4** | **Jun 11, '20** | | **8** | PAGES |

SUBJECT

**DRUG AND ALCOHOL TESTING**

contemporaneous, accurate, and articulable observations concerning the employee's appearance, behavior, speech, and/or body odors, made during, just preceding, or just after the employee's work shift.

b.    The determination of reasonable suspicion/cause must be documented. (The Reasonable Cause/Suspicion for Drug or Alcohol Testing form should be used by the employee's manager or supervisor.)

c.    Information on reasonable suspicion testing outside of regular business hours is available on the Employee Wellness Center intranet site.

d.    If an alcohol test is not administered within eight hours or a drug test within 32 hours, following the determination of reasonable suspicion or cause, the Company will cease attempts to administer the test.  A record stating the reasons for not administering a timely test should be prepared and retained on file by the department.

**5.6    Return-to-Work and CSA On-Call Testing Program –**

a.    Employees who test positive for drugs or alcohol in any test conducted under this Instruction may receive education and/or a treatment plan, as recommended by the MRO in consultation with the CSA Counselor.  The treatment plan may include an on-call testing program.

b.    The determination as to whether an employee will enter into the CSA On-Call Testing Program is at the sole discretion of the Employee Wellness Center's Administrative Physician and/or the MRO.

c.    Employees subject to the CSA On-Call Testing Program remain subject to random testing.  On-call tests are unannounced, and the employee is not provided with any prior notice.

d.    The Employee Wellness Center may determine that, in addition to participating in the On-Call Testing Program, the employee's continued participation in ongoing programs or support services are needed to assist the employee in complying with the recommendations of the MRO and CSA Counselor and maintaining sobriety or abstinence from drug or alcohol use for the duration of his or her employment with the Company. Recommendations will be documented in the employee's return-to-work evaluation report.  The treatment, treatment plan and education, and length of time an employee is required to participate in the On-Call Testing Program are at the sole discretion of the MRO.

e.    Any employee who has completed the recommended education and/or treatment plan must have a negative drug test and/or an alcohol test with a breath alcohol concentration of less than 0.02%, as applicable, before


conEdison

| DATE | NUMBER | SUPERSEDES | PAGE | 5 | OF |
|------|--------|------------|------|---|-----|
| Aug 20, 2020 | CI-560-4 | Jun 11, '20 | | 8 | PAGES |

SUBJECT

**DRUG AND ALCOHOL TESTING**

being medically cleared by the Employee Wellness Center to return to work and resume performing job functions.

5.7     ~~Fitness for Duty~~ –

a.    Any employee who reports for duty or remains on duty while under the influence of or impaired by alcohol, as indicated by the employee's appearance, behavior, speech, breath, body odors, or other indicators of alcohol misuse, will not be permitted to perform or continue to perform Company functions until an alcohol test is administered and the employee's blood alcohol concentration measures less than 0.02%.

b.    Employees are prohibited from reporting for duty, being on duty, or performing job functions within four hours after using alcohol.

c.    Employees are prohibited from reporting for duty, being on duty, or performing job functions while under the influence of drugs, impaired by drugs, or using illegal drugs.  Any employee who reports for duty or remains on duty while using or impaired by drugs, as indicated by the employee's appearance, behavior, speech, body odors, or other indicators of drug use, will not be permitted to perform or continue to perform Company functions until it is determined by the MRO or other designee that the employee can safely resume performing job functions.

5.8     **Refusal to Test** – An employee is considered to have refused to take a required alcohol and/or drug test when he or she:

a.    Fails to appear for any test, after being properly directed to report for testing, within a reasonable time, as determined by the Company.

b.    Fails to remain at the testing site until the testing process is complete.

c.    Fails to provide a urine specimen for a drug test.

d.    Fails to provide an adequate amount of saliva or breath for an alcohol test.

e.    Fails to permit the observation or monitoring of the provision of a specimen, when directed to provide a specimen in a directly observed or monitored collection for a drug test.

f.    Fails to provide a sufficient amount of urine when directed to provide a sample and the MRO determines, through a medical examination or evaluation, that there is no adequate medical explanation for the failure.

g.    Fails to provide a sufficient breath specimen and the MRO determines, through a medical examination or evaluation, that there is no adequate medical explanation for the failure.



conEdison

| DATE | NUMBER | SUPERSEDES | PAGE | **6** | OF |
|---|---|---|---|---|---|
| **Aug 20, 2020** | **CI-560-4** | **Jun 11, '20** | | **8** | PAGES |

SUBJECT

**DRUG AND ALCOHOL TESTING**

h.   Fails or refuses to take a second or additional test that the Company or the Collector has directed the employee to take.

i.   ~~Fails to undergo a medical examination or evaluation as directed by the~~ MRO or DER as part of the verification process.

j.   Refuses to sign the certification at Step 2 on the Alcohol Testing Form.

k.   Fails to cooperate with any part of the testing process (e.g., refusing to empty pockets when directed to do so by the collector, or behaving in a manner that disrupts the collection process).

l.   Has a verified adulterated or substituted test result, as reported by the MRO.

m.   Fails to follow the observer's instructions in a directly observed collection for a drug test (see Alcohol and Drug Testing Policy Direct Observation Protocol).

n.   Possesses or wears any prosthetic or other device that could be used to interfere with the collection for a drug test.

o.   Admits to the Collector or MRO that the employee adulterated or substituted the specimen.

**5.9   Record Keeping** – The Company maintains, in a secure location with controlled access, records concerning its drug and alcohol testing programs, as described below.

a.   The following records are maintained for a minimum of five years:

(1)   Employee evaluation and referrals to CSA Counselors.

(2)   Alcohol test results indicating a breath alcohol concentration of 0.02% or greater.

(3)   Verified positive drug test results.

(4)   Refusals to take a required drug or alcohol test.

(5)   Evidential Breath Testing Device calibration documentation.

(6)   Medical records, laboratory reports, and copies of the CCF reviewed by the MRO.

(7)   Documentation referenced in paragraphs 5.4 and 5.5 regarding post-incident testing and reasonable suspicion testing.


conEdison

| DATE | NUMBER | SUPERSEDES | PAGE | **7** | OF |
|------|--------|------------|------|-------|-----|
| **Aug 20, 2020** | **CI-560-4** | **Jun 11, '20** | | **8** | PAGES |

SUBJECT

**DRUG AND ALCOHOL TESTING**

b.    Access to Records.

(1)    Employees may obtain copies of any records maintained by the Employee Wellness Center pertaining to their use of drugs or alcohol or their drug or alcohol tests.  To obtain these records, the employee must make a written request to the Employee Wellness Center.

(2)    Employees may also authorize the Employee Wellness Center to release their drug and alcohol records to identified third parties.  To do so, the employee must complete and sign the Authorization for Release of Medical Records consent form to be processed by the Employee Wellness Center.

(3)    The Company may release or disclose an employee's drug and alcohol records or information without the employee's consent, in legal proceedings such as a lawsuit (e.g., a wrongful discharge action), a grievance (e.g., an arbitration concerning disciplinary action taken against the employee), an administrative proceeding (e.g., a worker's compensation or unemployment compensation hearing or other proceedings relating to a benefit sought by the employee), or any criminal or civil action.

(4)    The Company maintains all testing records separate from employee personnel files, either in locked cabinets with secure access or as secure electronically-maintained records.  Only personnel with an official, authorized business purpose will have access to an employee's drug and alcohol testing records maintained under this Instruction.

(5)    The Learning Center, Learning and Inclusion, will maintain education and training records for any manager or supervisor who has attended drug or alcohol training.  These records will be kept for the duration of the manager's or supervisor's employment plus five years.

**6.0    ADVICE AND COUNSEL** -- The Vice President, Human Resources, will provide advice and counsel on this Instruction.



| DATE | NUMBER | SUPERSEDES | PAGE  8 | OF |
|------|--------|-----------|---------|-----|
| **Aug 20, 2020** | **CI-560-4** | **Jun 11, '20** | **8** | PAGES |

 **Gmail**

Robert J <rj41926@gmail.com>

---

## Robert Joyce/Exit interview

**Steven Dauria** <Steven.Dauria@uwua1-2.org>                    Thu, Apr 8, 2021 at 4:49 PM
To: Robert J <rj41926@gmail.com>, Frank Morales <frank.morales@uwua1-2.org>

Good afternoon Rob,

I will follow up with the company as we have also not received the information requested. The Union has only received confirmation of receipt from the company on 3/31.

Once I receive more information or anything that was requested, I will keep you updated on this.  I also did attach and send authorization for release of medical you sent to the company in with my information request.

The union has not lost sight of this termination.


I know we spoke on Friday 4/2 on some of your concerns.

I spoke to Gene yesterday on your request to amend language e-mail. He has forward that to HR for their review and response.



Thank you,


**Steven D'Auria**

*U.W.U.A. A.F.L.-C.I.O. Local 1-2*

*Business Agent*

*5 West 37st 7th floor*

*New York, N.Y. 10018*

212.575-4400 Ext.2107

[Quoted text hidden]



# M Gmail

Robert J <rj41926@gmail.com>

---

**(no subject)**

---

Robert J <rj41926@gmail.com>                    Tue, Sep 27, 2022 at 8:16 PM
To: smokesquit00@icloud.com





⟨ 272

**2 People**

Your breaking my heart buddy.

Steve Buisness Agent

Remember what you asked for on your own and they send you is between you and the company I'm trying to make sure they send you what you requested.

This I asked for and other information is not the same with yours and they have time to send me that stuff



Apr 23, 2021, 10:18 AM

This is what I have been requesting for 44 days. *The shipping details and tracking numbers for specimen ID

 Gmail                                                    Robert J <rj41926@gmail.com>

## Company not prepared

**Robert J** <rj41926@gmail.com>                                    Fri, Jun 4, 2021 at 10:07 AM
To: Frank Morales <Frank.Morales@uwua1-2.org>, Steven Dauria <Steven.Dauria@uwua1-2.org>

The company requested a hearing with a judge, about two months ago, to protest me receiving unemployment benefits.
At the hearing that they requested they said they weren't prepared. That should speak volumes. The drug test,
according to the contract between Local 1-2 and Con Edison, should be a cancelled drug test. I think the company knows
that too now. Please let me know about a arbitration date and when I will have a chance to sit down with the lawyer.
Thanks.   Robert Joyce

 Gmail

**Robert J <rj41926@gmail.com>**

## Con Edison delaying a losing arbitration
4 messages

**Robert J <rj41926@gmail.com>**                                    Mon, Jun 14, 2021 at 10:18 AM
To: "james.shillitto@uwua.1-2.org" <james.shillitto@uwua.1-2.org>

President Shillitto,   Why is  the company delaying a timely Arbitration regarding my unfair termination?  Did they
communicate in writing? Did my Union simply agree to the delay? Who from the Union responded? Is that response in
writing? You must realize that the company is delaying because they know now they HAVE A LOSING CASE!  They were
not prepared to present a case in a unemployment hearing that THEY REQUESTED.  That should raise red flags alone.
They have refused to hand over documentation that they are required to provide even though I SENT OVER 7 WRITTEN
REQUESTS. They have BROKEN THE LAW and the CONTRACT and I am out on the street.  The two
pieces of documentation that they forwarded to my agent, the chain of custody forms, is filled with errors and omissions,
and it is unsigned by both a certified scientist and Con Ed's Medical Review Officer as it is required by law to do so.  I
never used the substance I was fired for.  I don't mean any  disrespect going over my agents head but I need to do
everything I can do to correct this situation for my and my families well being so I'm reaching out to you, the PRESIDENT
, for help.

I am a member in good standing and  a shop steward and a  active supporter of Local 1-2.  Can you please respond.?
Thank you.

        Robert Joyce 917 576-9289

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>              Tue, Jun 15, 2021 at 11:37 AM
To: rj41926@gmail.com

    **Delivery incomplete**

There was a temporary problem delivering your message to
**james.shillitto@uwua.1-2.org**. Gmail will retry for 46 more
hours. You'll be notified if the delivery fails permanently.

The response was:

DNS Error: 4518854 DNS type 'mx' lookup of uwua.1-2.org responded with code NOERROR 4518854 DNS
type 'aaaa' lookup of localhost. responded with code NXDOMAIN 4518854 DNS type 'a' lookup of
localhost. responded with code NXDOMAIN

Final-Recipient: rfc822; james.shillitto@uwua.1-2.org
Action: delayed
Status: 4.0.0
Diagnostic-Code: smtp; DNS Error: 4518854 DNS type 'mx' lookup of uwua.1-2.org responded with code NOERROR
  4518854 DNS type 'aaaa' lookup of localhost. responded with code NXDOMAIN

4518854 DNS type 'a' lookup of localhost. responded with code NXDOMAIN
Last-Attempt-Date: Tue, 15 Jun 2021 08:37:00 -0700 (PDT)
Will-Retry-Until: Thu, 17 Jun 2021 07:18:35 -0700 (PDT)


---------- Forwarded message ----------
From: Robert J <rj41926@gmail.com>
To: "james.shillitto@uwua.1-2.org" <james.shillitto@uwua.1-2.org>
Cc:
Bcc:
Date: Mon, 14 Jun 2021 10:18:24 -0400
Subject: Con Edison delaying a losing arbitration
President Shillitto,   Why is  the company delaying a timely Arbitration regarding my unfair termination?  Did they
communicate in writing? Did my Union simply agree to the delay? Who from the Union responded? Is that response in
writing? You must realize that the company is delaying because they know now they HAVE A LOSING CASE!  They were
not prepared to present a case in a unemployment hearing that THEY REQUESTED.  That should raise red flags alone.
They have refused to hand over documentation that they are required to provide even though I SENT OVER 7 WRITTEN
REQUESTS. They have BROKEN THE LAW and the CONTRACT and I am out on the street.  The two
pieces of documentation that they forwarded to my agent, the chain of custody forms, is filled with errors and omissions,
and it is unsigned by both a certified scientist and Con Ed's Medical Review Officer as it is required by law to do so.  I
never used the substance I was fired for.  I don't mean any  disrespect going over my agents head but I need to do
everything I can do to correct this situation for my and my families well being so I'm reaching out to you, the PRESIDENT
, for help.

I am a member in good standing and  a shop steward and a  active supporter of Local 1-2.  Can you please respond.?
Thank you.

            Robert Joyce 917 576-9289


---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                        Wed, Jun 16, 2021 at 2:27 PM
To: rj41926@gmail.com




# Delivery incomplete

There was a temporary problem delivering your message to
**james.shillitto@uwua.1-2.org**. Gmail will retry for 19 more
hours. You'll be notified if the delivery fails permanently.


The response was:

```
DNS Error: 5155523 DNS type 'mx' lookup of uwua.1-2.org responded with code NOERROR 5155523 DNS
type 'aaaa' lookup of localhost. responded with code NXDOMAIN 5155523 DNS type 'a' lookup of
localhost. responded with code NXDOMAIN
```


Final-Recipient: rfc822; james.shillitto@uwua.1-2.org
Action: delayed
Status: 4.0.0
Diagnostic-Code: smtp; DNS Error: 5155523 DNS type 'mx' lookup of uwua.1-2.org responded with code NOERROR

5155523 DNS type 'aaaa' lookup of localhost. responded with code NXDOMAIN
5155523 DNS type 'a' lookup of localhost. responded with code NXDOMAIN
Last-Attempt-Date: Wed, 16 Jun 2021 11:27:54 -0700 (PDT)
Will-Retry-Until: Thu, 17 Jun 2021 07:18:35 -0700 (PDT)


---------- Forwarded message ----------
From: Robert J <rj41926@gmail.com>
To: "james.shillitto@uwua.1-2.org" <james.shillitto@uwua.1-2.org>
Cc:
Bcc:
Date: Mon, 14 Jun 2021 10:18:24 -0400
Subject: Con Edison delaying a losing arbitration
President Shillitto,   Why is  the company delaying a timely Arbitration regarding my unfair termination?  Did they
communicate in writing? Did my Union simply agree to the delay? Who from the Union responded? Is that response in
writing? You must realize that the company is delaying because they know now they HAVE A LOSING CASE!  They were
not prepared to present a case in a unemployment hearing that THEY REQUESTED.  That should raise red flags alone.
They have refused to hand over documentation that they are required to provide even though I SENT OVER 7 WRITTEN
REQUESTS. They have BROKEN THE LAW and the CONTRACT and I am out on the street.  The two
pieces of documentation that they forwarded to my agent, the chain of custody forms, is filled with errors and omissions,
and it is unsigned by both a certified scientist and Con Ed's Medical Review Officer as it is required by law to do so.  I
never used the substance I was fired for.  I don't mean any  disrespect going over my agents head but I need to do
everything I can to correct this situation for my and my families well being so I'm reaching out to you, the PRESIDENT
, for help.

I am a member in good standing and  a shop steward and a  active supporter of Local 1-2.  Can you please respond.?
Thank you.

            Robert Joyce 917 576-9289


**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Thu, Jun 17, 2021 at 11:55 AM
To: rj41926@gmail.com




## Address not found

Your message wasn't delivered to **james.shillitto@uwua.1-
2.org** because the domain uwua.1-2.org couldn't be found.
Check for typos or unnecessary spaces and try again.


The response was:

DNS Error: 7377783 DNS type 'mx' lookup of uwua.1-2.org responded with code NOERROR 7377783 DNS
type 'aaaa' lookup of localhost. responded with code NXDOMAIN 7377783 DNS type 'a' lookup of
localhost. responded with code NXDOMAIN


Final-Recipient: rfc822; james.shillitto@uwua.1-2.org
Action: failed
Status: 4.0.0

Diagnostic-Code: smtp; DNS Error: 7377783 DNS type 'mx' lookup of uwua.1-2.org responded with code NOERROR
7377783 DNS type 'aaaa' lookup of localhost. responded with code NXDOMAIN
7377783 DNS type 'a' lookup of localhost. responded with code NXDOMAIN
Last-Attempt-Date: Thu, 17 Jun 2021 08:55:53 -0700 (PDT)


---------- Forwarded message ----------
From: Robert J <rj41926@gmail.com>
To: "james.shillitto@uwua.1-2.org" <james.shillitto@uwua.1-2.org>
Cc:
Bcc:
Date: Mon, 14 Jun 2021 10:18:24 -0400
Subject: Con Edison delaying a losing arbitration
President Shillitto,   Why is  the company delaying a timely Arbitration regarding my unfair termination?  Did they
communicate in writing? Did my Union simply agree to the delay? Who from the Union responded? Is that response in
writing? You must realize that the company is delaying because they know now they HAVE A LOSING CASE!  They were
not prepared to present a case in a unemployment hearing that THEY REQUESTED.  That should raise red flags alone.
They have refused to hand over documentation that they are required to provide even though I SENT OVER 7 WRITTEN
REQUESTS. They have BROKEN THE LAW and the CONTRACT and I am out on the street.  The two
pieces of documentation that they forwarded to my agent, the chain of custody forms, is filled with errors and omissions,
and it is unsigned by both a certified scientist and Con Ed's Medical Review Officer as it is required by law to do so.  I
never used the substance I was fired for.  I don't mean any  disrespect going over my agents head but I need to do
everything I can do to correct this situation for my and my families well being so I'm reaching out to you, the PRESIDENT
, for help.

I am a member in good standing and  a shop steward and a  active supporter of Local 1-2.  Can you please respond.?
Thank you.

Robert Joyce 917 576-9289

 Gmail

Robert J <rj41926@gmail.com>

## Joyce

**Steven Dauria** <Steven.Dauria@uwua1-2.org>                                    Tue, Jul 6, 2021 at 1:40 PM
To: Robert J <rj41926@gmail.com>

When I spoke with Company it was labor Vinny Frankel. I also spoke before that to EWC medical manager. It wasn't delayed it was moved and that was Coned attorny and also arbitrator changed it, they weren't ready. So that would be their attorney and arbitrator. I'm not sure who is on Coned case as for attorney. At this point our attorney once caught up will talk to coned attorney not me.

Steven D'Auria
U.W.U.A. A.F.L.-C.I.O. Local 1-2
Business Agent
5 West 37st 7th floor
New York, N.Y. 10018

**From:** Robert J <rj41926@gmail.com>
**Sent:** Tuesday, July 6, 2021 1:18:55 PM
**To:** Steven Dauria <Steven.Dauria@uwua1-2.org>
**Subject:** Re: Joyce

[Quoted text hidden]

9/27/22, 10:27 AM

Gmail - Joyce

 Gmail

Robert J <rj41926@gmail.com>

## Joyce

**Robert J** <rj41926@gmail.com>                                           Tue, Jul 6, 2021 at 1:48 PM
To: Steven Dauria <Steven.Dauria@uwua1-2.org>

Ok. Thanks.  Did Vinny Frankel give a reason why the company ultimately decided not to  present evidence and
witnesses to a judge after requesting the hearing to protest me receiving unemployment benefits?  I can't see what
reason they could give other than stating the truth. But they should be asked to justify it.

[Quoted text hidden]

 **Gmail**                                    Robert J <rj41926@gmail.com>

## Joyce

**Steven Dauria** <Steven.Dauria@uwua1-2.org>                    Tue, Jul 6, 2021 at 1:54 PM
To: Robert J <rj41926@gmail.com>

No he didn't and he won't. Those cases have nothing to do with the Union. He knows that also. The company is only looking at arbitration.

Steven D'Auria
U.W.U.A. A.F.L.-C.I.O. Local 1-2
Business Agent
5 West 37st 7th floor
New York, N.Y. 10018

**From:** Robert J <rj41926@gmail.com>
**Sent:** Tuesday, July 6, 2021 1:48:14 PM
[Quoted text hidden]

[Quoted text hidden]

 Gmail                                    Robert J <rj41926@gmail.com>

## Chain of Custody documents

**Steven Dauria** <Steven.Dauria@uwua1-2.org>                    Tue, May 18, 2021 at 2:22 PM
To: Robert J <rj41926@gmail.com>
Cc: Frank Morales <frank.morales@uwua1-2.org>

Robert-

The company has sent me both chain of custody today.
Attached are the Chain of custody.

Thank you,

Steven D'Auria
U.W.U.A. A.F.L.-C.I.O. Local 1-2
Business Agent
5 West 37st 7th floor
New York, N.Y. 10018

**2 attachments** — Download all attachments

**Joyce Chain of Custody Documents Collected 1-29-21 Reported 2-6-21.pdf**
1181K View as HTML Download

**Joyce Chain of Custody Split Sample Collected 1-29-21 Reported 3-1-21.pdf**
930K View as HTML Download

✕    Joyce Chain of Custody...





✕    Joyce Chain of Custody S...     

FORENSIC DRUG TESTING CUSTODY AND CONTROL FORM    Quest

800 877 7484
www.questdiagnostics.com/mydrugtest

SPECIMEN ID NO.

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.    B. MRO Name, Address, Phone No. and Fax No.

C. Donor SSN or Employee I.D. No.

E. Drug Tests to be Performed    ☐ THC, COC, PCP, OPI, AMP    ☐ THC & COC Only    ☐ Other (specify)

F. Collection Site Name    Collection Site Code

Address    Collector Phone No.

City, State and Zip

**STEP 2: COMPLETED BY COLLECTOR** (make remarks when appropriate) Collector reads specimen temperature within 4 minutes.

REMARKS

**STEP 3:** Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY TEST FACILITY**

X _____    SPECIMEN BOTTLE(S) RELEASED TO
☐ Quest Diagnostics Courier
FedEx
Other

**STEP 5: COMPLETED BY DONOR**

X _____    Robert M Joyce    1-29-21

911 576 1239    917 576 1289    3-2-76

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

☐ NEGATIVE    ☐ POSITIVE    ☐ TEST CANCELLED

☐ REFUSAL TO TEST

X _____    2/1/21

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER  SPLIT SPECIMEN**

☐ RECONFIRMED    ☐ TEST CANCELLED
☐ FAILED TO RECONFIRM

X _____

9/27/22, 10:10 AM
Gmail - Joyce

 Gmail

Robert J <rj41926@gmail.com>

## Joyce
1 message

Robert J <rj41926@gmail.com>                                   Fri, May 21, 2021 at 10:14 AM
To: Frank Morales <Frank.Morales@uwua1-2.org>, Steven Dauria <Steven.Dauria@uwua1-2.org>

Steven and Frank,   Now that's it's obvious to all of us that the company withheld paperwork because it reveals that the
drug test results are no longer valid did you guys reach out to Labor or HR and demand that I get reinstated?   Robert
Joyce

 Gmail

Robert J <rj41926@gmail.com>

**Robert Joyce /22095/ Invalid drug test result**
1 message

**Robert J** <rj41926@gmail.com>                                                                Mon, May 24, 2021 at 7:31 AM
To: "Moskowitz, Jeffrey P." <moskowitzje@coned.com>
Cc: "Ciulloc@coned.com" <Ciulloc@coned.com>
Bcc: Frank Morales <Frank.Morales@uwua1-2.org>, "Lattanzig@coned.com" <Lattanzig@coned.com>, "Pluchinom@coned.com" <Pluchinom@coned.com>,
"Reillybr@coned.com" <Reillybr@coned.com>, Steven Dauria <Steven.Dauria@uwua1-2.org>

Dr. Moskowitz, I have requested the chain of custody forms and the data packages for specimen ID#0684573 six times beginning on March 11. I sent follow up
emails to these requests. Although these documents were required to be in my possession ten days of my request they have never been sent to me.

The chain of custody forms were sent to my buisness agent on May 18 and he forwarded them to me the same day. After reviewing these forms it is hard not to think
that they were withheld deliberately. Besides numerous mistakes there was the fatal flaw that the documents are not signed or confirmed. Two critical sections of the
form designated specifically for split level testing are completely empty. There is no certifying scientists signature from the Quest Diagnostic in Tucker Georgia and
no signature from you confirming the labs findings. That this laboratory lost its certification to conduct drug testing only raises more questions.

You are the person that the company has tasked with the duty of declaring drug tests valid or not. It is clear that this test should be declared invalid. Please notify the
company's HR department and my department that you are doing so.

Let me state for the record that I have never in my life taken the drug that I have been fired for using. I am asking you to correct this horrible situation so I can get
back to work. Thank you.

        Robert Joyce

9/27/22, 10:30 AM                                    Gmail - Joyce

 **Gmail**                                Robert J <rj41926@gmail.com>

## Joyce
1 message

**Robert J** <rj41926@gmail.com>                    Mon, Jun 28, 2021 at 9:09 PM
To: Frank Morales <Frank.Morales@uwua1-2.org>

Frank, I attached the letter the company wrote to the Department of Labor in April requesting a hearing so they could provide witnesses and evidence and try to prevent me from receiving unemployment benefits. A lot has changed since that letter was written in April. To sum it up the company that TERMINATED me on on March 5 and REQUESTED a hearing with an administrative judge on April 22 was NOT PREPARED for the case on June 3. A judgment was issued in my favor. The company could have reopened the case in a timely fashion but HAS DECIDED NOT TO DO SO. It's obvious why they were not prepared to present there case Frank.

The company is now aware that the fatal flaws on the chain of custody forms are no longer there little secret and according to the collective bargain agreement it is now a CANCELLED DRUG TEST.

The company has violated the contract, broken laws and has illegally withheld documents from me and there doesn't seem to be ANY outrage or urgency from my Union representatives.

Frank, for me and my family's sake can you please call the company on my behalf and try to get me reinstated now. Con Edison not being prepared at a hearing they requested says a lot. I can't see how the company could even justify these actions other than stating the truth that they know they have a losing case.

How was the company allowed to delay my arbitration without any protest from my Union? What reason did they give for the delay? What if they want to delay again? Has my reinstatement been demanded by you or Steve already? If you have with who did you speak to? If you haven't then why not?

I would appreciate answers to these questions. The company is rolling the dice in hopes that the arbitrator doesn't follow the law and upholds my termination and it would be a damn shame and a disservice for a labor union and for my union representatives to not call them out on it and to not fight to get me back to work before my arbitration. If there is anything that I'm saying that you disagree with please tell me. Thank you.

Robert Joyce

# INDUSTRY NEWS

## Quest Diagnostics Announces Lab Closure in Atlanta, GA

Posted on 1/15/2021 by Corporate Communications Department

Tags : Drug Screening

*On January 5, 2021, Quest Diagnostics announced plans to close their Atlanta lab (located in Tucker, GA), decreasing their number of operational labs to two (2).*

Effective March 6, 2021 the Lenexa, KS and Norristown, PA labs will be the only labs performing workforce drug testing including hair, oral fluid and urine. The lab closing in Georgia only processed urine samples.

# Quest Diagnostics revitalizes building in Tucker

60,000 – the number of lab tests run per day at this laboratory facility in Tucker, GA. Quest Diagnostics is a worldwide leader in health diagnostics and annually serves one in three adult Americans and half the physicians and hospitals in the United States.

With this kind of resume and demand, the project Leapley completed had no time for downtime; therefore, building for the Quest campus in Tucker took special attention and skill. The renovation of 17,500 SF impacted 18 working departments.

"We moved 18 work cells and 250 people have new working environments," said Peter Moore at the grand opening of the new PDM and employer solutions spaces. "At the end of the day, I think everyone will excel in their new space."

"The three objectives of this project were to improve quality, enhance customer service levels, and set ourselves up for growth," said Greg Ourednik, the Quest project champion and Executive Director. "I'm happy to say we have accomplished that. It truly embodies the team effort from the folks who did the construction and who had the design vision. The timeline was aggressive. We took the ideas and asked 'How can we design a space to deliver results and be a workplace people want to be in?'"

# FORENSIC DRUG TESTING CUSTODY AND CONTROL FORM



Quest
Diagnostics

800-877-7484

SPECIMEN ID NO.

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**            LAB ACCESSION NO.

A. Employer Name, Address, I.D. No.                    B. MRO Name, Address, Phone No. and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test:  ☐ Pre-employment (1)  ☐ Random (3)  ☐ Reasonable Suspicion/Cause (5)  ☐ Post-Accident (2)  ☐ Promotion (22)
☐ Return to Duty (6)  ☐ Follow-up (23)  ☒ Other (specify) (99) _____

E. Drug Tests to be Performed:  ☐ THC, COC, PCP, OPI, AMP  ☐ THC & COC Only  ☐ Other (specify)

F. Collection Site Name: _____      Collection Site Code: _____
  Address: _____                      Collector Phone No.: _____
  City, State and Zip: _____          Collector Fax No.: _____

**STEP 2: COMPLETED BY COLLECTOR (make remarks when appropriate) Collector reads specimen temperature within 4 minutes.**
Temperature between 90° and 100° F? ☒ Yes ☐ No, Enter Remark  Collection: ☒ Split ☐ Single ☐ None Provided, Enter Remark  ☒ Observed, (Enter Remark)
REMARKS

**STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)**

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY TEST FACILITY**
I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable requirements.

| | **SPECIMEN BOTTLE(S) RELEASED TO:** |
| --- | --- |
| | ☐ Quest Diagnostics Courier |
| | ☒ FedEx |
| | ☐ Other |

_____        Signature of Collector
(Print) Collector's Name (First, MI, Last)      Date (Mo./Day/Yr.)    Time of Collection  ☐AM ☐PM    Name of Delivery Service

**STEP 5: COMPLETED BY DONOR**
I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _____
  Signature of Donor                          (PRINT) Donor's Name (First, MI, Last)            Date (Mo./Day/Yr.)

Daytime Phone No. (    )                  Evening Phone No. (    )                    Date of Birth

After the Medical Review Officer receives the test results for the specimen identified by this form, he/she may contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). – DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER – PRIMARY SPECIMEN**
In accordance with applicable requirements, my verification is:

☐ **NEGATIVE**   ☐ **POSITIVE** for: _____
    ☐ DILUTE _____
☐ **REFUSAL TO TEST** because – check reason(s) below:
    ☐ ADULTERATED (adulterant/reason): _____            ☐ **TEST CANCELLED**
        ☐ SUBSTITUTED
            ☐ OTHER _____
REMARKS:

X _____
  Signature of Medical Review Officer            (PRINT) Medical Review Officer's Name (First, MI, Last)        Date (Mo./Day/Yr.)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER – SPLIT SPECIMEN**
In accordance with applicable requirements, my verification for split specimen (if tested) is:

☐ **RECONFIRMED** for: _____
    ☐ **FAILED TO RECONFIRM** for: _____            ☐ **TEST CANCELLED**
REMARKS

X _____
  Signature of Medical Review Officer            (PRINT) Medical Review Officer's Name (First, MI, Last)

**150 White Plains Rd.**
**Suite 204**
**Tarrytown, NY 10591**



**(914) 593-0300 Ph.**
**(914) 347-4901 Fax**
**www.claritytesting.com**

## CON EDISON: Unusual Collection Statement

Donor Name: _ROBERT JOYCE_          Donor ID: _22095_

Location: _4 Irving Place_          Collection Date: _7/15/16_

Reason for Testing: _CSA - ON CALL_ DOT _____ Corporate _✓_

Specimen #: _3914162_

After the donor completed his Breath Alcohol test I explained to him the procedures for an observed urine drug collection which was required for his drug test. We went into the bathroom for the observed collection. He initially was following instructions but tried to turn away from me when it was time to urinate into the cup. He quickly handed me the specimen cup and at the same time I heard a strange sound so I asked him what that noise was. The donor told me it was his belt but to me it sounded like a bottle. He insisted that he did not have a bottle. I instructed him to pull his shirt above his stomach and lower his shorts and undergarments for a second time and it was then that I noticed there was a small bottle hidden in the leg of his pants. I told him that I saw the bottle and that the test was terminated. At the same moment, the bottle happened to fall on the floor. He asked me if he could provide another specimen instead of that one. I told him that he would not be allowed to provide another specimen and that the testing was now done. I also told him that I was going to inform the DER about the situation. At that point, the donor took the bottle and left the testing site. I immediately informed the DER (Tricia Medlin- Fogg) by phone and the MRO (Dr. Alexander) in person. I discarded the specimen.

DER notified (name) _Tricia Medlin-Fogg_  MRO notified (name) _Dr. Alexander_

Demeanor of Donor: _Cooperative until bottle discovered._

Certified DOT Specimen Collector: Printed Name _Brandon Hogg_

Certified DOT Specimen Collector Signature: _[signature]_

Date: _7/21/16_



Interview No. 156984                    **Employee Interview**          🖨 Print Page

| Interviewee Data: | Previous interviews selected for consideration | | | |
|---|---|---|---|---|
| **Robert M. Joyce** | Interview ID | Interview Date | Type Codes | Action Codes |
| Emp No: 22095 (CE) | 156922 | 07/18/2016 | Substance abuse | Suspension pending investigation |
| Hire Date: 07/04/2009 (Inactive) | 156744 | 06/29/2016 | Substance abuse | Final warning |
| Org: Manhattan | 154679 | 03/17/2016 | Absence | Verbal warning |
| Dept: Manhattan Elect | 152012 | 09/02/2015 | Substance abuse | Counseling memo |
| Construction | | | | |

**Interviewee Data:**
**Robert M. Joyce**
Emp No: 22095 (CE)
Hire Date: 07/04/2009 (Inactive)
Org: Manhattan
Dept: Manhattan Elect
Construction
Sect: MANH District 1
Underground
Job Title: General Utility
Worker L1-2

**Interviewer Data:**
**Zeffery O. Frazier**
Emp No: 16959 (CE) (3H)
Org: Manhattan
Dept: Manhattan Elect
Construction
Job Title: Section Manager

**Event Summary**

**Date Event Occurred:** 07/25/2016

**Details:**

On 07/15/2016, you were directed to provide a urine specimen at Occupational Health (4 Irving Place), pursuant to the Company's On-Call Program.

After conducting the observed collection, the Clarity Collector heard a noise that sounded like a bottle. When asked what the noise was, you told the Collector it was your belt. The collector asked you to pull down your pants and lift your shirt, at which time he noticed a bottle hidden in the leg of your pants. You asked if you could provide another sample instead of the initial sample. You were informed that you could not and that the test was terminated. You then took the bottle and left the collection site.

**Disposition:**

On 7/15/16, you were witnessed attempting to provide an adulterated/substituted sample and then left the testing site prior to completing the testing process.

Your actions are considered a "Refusal to Test" and a violation of our Drug and Alcohol Testing policy (CI-560-4). For this reason, you are not eligible for treatment and therefore, you are terminated effective immediately.

**Interview Codes**

| Action(s): | Event Type(s): |
|---|---|
| Discharge | Refusal to Test - CSA |
| | **Category Type:** Business Conduct |

**Interview Summary**

**Employee Statement:**
employee states he was never given a chance to give another sample. Knowing what he knows now, he would have done things differently. he would have never rang out and not call anyone.

**Interview Date:** 07/29/2016    **Interview Time:** 09:00 AM

**Location:** 4 Irving Place

**Union Representative Present:** Yes

**Interview Attendees:**

| Name | Title |
|---|---|
| Robert M. Joyce | General Utility Worker L1-2 ~ *Interviewee* |
| Zeffery O. Frazier | Section Manager ~ *Interviewer* |
| Barbara J. Michaelides | Sr Specialist |
| Timothy J. Elphick | Distribution Splicer L1-2 ~ *Shop Steward* |

Last updated by: Zeffery O. Frazier (7/29/2016 2:00 PM)

**FORENSIC DRUG TESTING CUSTODY AND CONTROL FORM**

Quest
Diagnostics
800-877-7484
www.questdiagnostics.com/mydrugtest

SPECIMEN ID NO.

LAB ACCESSION NO.

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.

B. MRO Name, Address, Phone No. and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☐ Pre-employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post Accident ☐ Return to Duty ☐ Follow-up ☑ Other (specify) _____

E. Drug Tests to be Performed: ☐ THC, COC, PCP, OPI, AMP    ☐ THC & COC Only    ☐ Other (specify) _____

F. Collection Site Name: _____

Address: _____

City, State and Zip: _____

Collection Site Code: _____

Collector Phone No.: _____

Collector Fax No.: _____

**STEP 2: COMPLETED BY COLLECTOR (make remarks when appropriate) Collector reads specimen temperature within 4 minutes.**

Temperature between 90° and 100° F? ☑ Yes ☐ No, Enter Remark | Collection: ☐ Split ☐ Single ☐ None Provided, Enter Remark | ☐ Observed, (Enter Remark)
REMARKS

**STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)**

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY TEST FACILITY**

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable requirements.

X _____
Signature of Collector

_____ (Print) Collector's Name (First, MI, Last)    Date (Mo./Day/Yr.)    AM / PM    Time of Collection

**SPECIMEN BOTTLE(S) RELEASED TO:**
☐ Quest Diagnostics Courier
☐ FedEx
☐ Other

Name of Delivery Service

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _____
Signature of Donor

(PRINT) Donor's Name (First, MI, Last) Robert M Joyce    Date (Mo./Day/Yr.) 1/29/21

Daytime Phone No. (917) 576-9289    Evening Phone No. (917) 576-9289    Date of Birth 2/2/76 Mo. Day Yr.

After the Medical Review Officer receives the test results for the specimen identified by this form, he/she may contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). – DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER – PRIMARY SPECIMEN**

In accordance with applicable requirements, my verification is:

☐ NEGATIVE ☑ POSITIVE for: METHAMPHETAMINE

☐ DILUTE

☐ REFUSAL TO TEST because – check reason(s) below:
☐ ADULTERATED (adulterant/reason): _____
☐ SUBSTITUTED
☐ OTHER

☐ TEST CANCELLED

REMARKS: _____

X _____
Signature of Medical Review Officer

(PRINT) Medical Review Officer's Name (First, MI, Last) Jeffrey Nuslow    Date (Mo./Day/Yr.) 3/1/21

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER – SPLIT SPECIMEN**

In accordance with applicable requirements, my verification for split specimen (if tested) is:

☑ RECONFIRMED for: METHAMPHETAMINE

☐ FAILED TO RECONFIRM for: _____

☐ TEST CANCELLED

REMARKS: _____

X _____
Signature of Medical Review Officer

(PRINT) Medical Review Officer's Name (First, MI, Last) Jeffrey Nuslow D    Date (Mo./Day/Yr.) 8/1/21

**COPY 2 - MEDICAL REVIEW OFFICER COPY**

Case 1:22-CV-00801-AT-JLC

Page 1 of 1

Fax this image

**FORENSIC DRUG TESTING CUSTODY AND CONTROL FORM**

6174941

Quest Diagnostics
777 Montreal Circle, Floor
Tucker, GA 30084

7826555D

Quest Diagnostics
400 Egypt Rd
Norristown, PA 19483

10380166  0684573 SPECIMEN ID NO.  10380166  0684573

LAB ACC

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, Phone No. and Fax No.
CLARITY BENEFITS/MDR
CONSOLIDATED EDISON
4 IRVING PLACE
NEW YORK NY 10003
PH: 212-766-7937 FAX: 212-614-1737

B. MRO Name, Address, Phone No. and Fax No.    FORM ID. NI4800020
BARBARA JEUNEROSKOWITZ
CON EDISON MEDICAL REVIEW
4 IRVING PLACE, NEW DEPT
NEW YORK NY 10003
PH: 212-740-7987 FAX: 646-654-2691

C. Donor SSN or Employee I.D. No.    22095

D. Reason for Test: ☐ Pre-employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post Accident ☐ Return to Duty ☐ Follow-up ☑ Other (specify) CSA

E. Drug Tests to be Performed: ☐ THC, COC, PCP, OPI, AMP    ☐ THC & COC Only    ☐ Other (specify)

1960SN 21021    (X) 2230TH SOP 10-50 MARYLENIT    ( ) 30380N SVR CANNABINOIDS 111
                  ( ) 23474N M BUPR_REL(SUBOXONE)    ( ) 23723N 9 PANEL W/OPI NO THC

F. Collection Site Name: CCN
Address: WEST 28TH ST
City, State and Zip: NYC NYC

Collection Site Code:

Collector Phone No.
Collector Fax No.  914-5/30-20

**STEP 2: COMPLETED BY COLLECTOR (make remarks when appropriate) Collector reads specimen temperature within 4 minutes.**
Temperature between 90° and 100° F? ☑ Yes ☐ No, Enter Remark | Collection: ☐ Split ☐ Single ☐ None Provided, Enter Remark | ☑ Observed, (Enter Remark)
REMARKS

**STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s).**
**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY TEST FACILITY**
SPECIMEN BOTTLE(S) RELEASED TO:
☑ Quest Diagnostics Courier
☐ FedEx
☐ Other

X _____  1/29/21  4:32
Signature of Collector    Date    Time    Type of Collection

RECEIVED AT LAB
X _____  Maryniesha Ainh
Signature of Accessioner / Representative of Custody    Date

Primary Specimen Bottle Seal Intact
☐ Yes  ☐ No
If No, Enter remarks in Step 5A.

SPECIMEN BOTTLE(S) RELEASED TO:

**STEP 5A: PRIMARY SPECIMEN REPORT - COMPLETED BY TEST FACILITY**
☐ NEGATIVE  ☐ POSITIVE for: ☑ Marijuana Metabolite (69-THCA) ☑ Methamphetamine ☐ MDMA ☐ 6-Acetylmorphine ☐ OXYC ☐ NYC
☐ DILUTE ☐ Cocaine Metabolite (BZE) ☐ Amphetamine ☐ MDA ☐ Morphine ☐ OXYM ☐ HYM
☐ PCP ☐ Codeine
☐ REJECTED FOR TESTING ☐ ADULTERATED ☐ SUBSTITUTED ☐ INVALID RESULT
REMARKS: D.Methamphetamine 91 %    Amphetamine 100170 ng/ml
L-Methamphetamine 9 %    Methamphetamine 14336 ng/ml

Test Facility (if different from above)

X _____    DAVID WALLNER    FEB 0 6 2021
Signature of Certifying Scientist    (Print) Certifying Scientist's Name (First, MI, Last)    Date

**STEP 5b: PRIMARY SPECIMEN REPORT - COMPLETED BY SPLIT TESTING LABORATORY**
Quest Diagnostics
1777 Montreal Circle
Tucker GA 30084
678-406-1100
Laboratory Address

☑ RECONFIRMED ☐ FAILED TO RECONFIRM - REASON See Report

X _____  ELEAN WHITE    FEB 1 7 2021
Signature of Certifying Scientist    (Print) Certifying Scientist's Name (First, MI, Last)    Date

COPY 1 - TEST FACILITY COPY

https://www.questdiagnostics-ccf.com/LDisplmg.asp?SampleID=0684573&ImgID=159265048&L=1    2/10/2021

 Gmail                                          Robert J <rj41926@gmail.com>

## Thoughts?

**Robert J <rj41926@gmail.com>**                              Tue, Oct 5, 2021 at 5:49 PM
To: Micah Wissinger <mwissinger@levyratner.com>

Micah - I understand they can make the argument that the arbitrator didn't disregard the DOT regs because he talks about them in his decision.  However, I believe we can make a stronger argument than he did.

First, he does not identify clause Article 10 paragraph 3 as a relevant clause.  This clause requires the company to follow ALL DOT  regulations.

Secondly, he writes that because there are no timelines, there can be no fatal flaw.  He completely disregards the timelines contained in 40.167,  40.187 and 40.205.  He's also disregarding 40.205 again which  requires the MRO to cancel the test.

Third, during the arbitration the arbitrator stated that he was not going to allow all DOT regs in as evidence, revealing that he intended to disregard them.

Thanks for the response.
[Quoted text hidden]



**conEdison**
a conEdison, inc. company

Consolidated Edison Company
of New York, Inc.
4 Irving Place
New York NY  10003-0987

0810

April 12, 2021

NYS Department of Labor
P.O. Box 15131
Albany, NY 12212-5131

**Request for hearing – Robert M Joyce**

To whom it may concern:

We respectfully disagree with the Department of Labor's determination that the claimant, Robert M Joyce is eligible to receive unemployment insurance benefits and request that a hearing be held on the matter before an impartial Administrative Law Judge.

The claimant's first warning for violating the company's substance abuse policy was administered on September 2, 2015. The warning stated that future violations would result in termination. The claimant received a second warning for violating the policy on June 29, 2016 and placed on a final warning. He was informed that future violations will result in termination. On July 18, 2016, the claimant was terminated for violating the policy for the third time. Through a settlement agreement between the union and the company, the claimant was reinstated. The claimant signed the agreement which stated that future violations will result in termination. On January 29, 2021, the claimant was terminated again after another policy violation.

The company requests the opportunity to present documentation and witnesses during a hearing.

We ask for your kind consideration in this matter and hope that you grant the company a hearing.

Sincerely,

Lou Winington
Senior Specialist – HR Employee & Labor Relations
Consolidated Edison Company of NY
4 Irving Place - 15th floor, New York, NY 10003
Phone: (212)-460-3051

RECEIVED
UNEMPLOYMENT INSURANCE DIVISION

APR 2 2 2021

UI RECORDS SECTION
TCC CENTRAL SUPPORT UNIT

E-3

3/

 Gmail

Robert J <rj41925@gmail.com>

**FW: Co.5 (a)-(f) and Co.7**
1 message

**Micah Wissinger** <mwissinger@levyratner.com>                                                                    Tue, Aug 3, 2021 at 12:57 PM
To: Robert J <rj41926@gmail.com>, "D'Auria, Steven" <Steven.Dauria@uwua1-2.org>

**From:** Gladstone, Amy J <GLADSTONEA@coned.com>
**Sent:** Tuesday, August 3, 2021 12:52 PM
**To:** Arthur Riegel (ARIEGELESQ@GMAIL.COM) <ariegelesq@gmail.com>; Micah Wissinger <mwissinger@levyratner.com>; Moskowitz, Jeffrey P.
<MOSKOWITZJE@coned.com>
**Subject:** Co.5 (a)-(f) and Co.7

Get Outlook for iOS

📎 **Receipt_2021-08-03_124220.pdf**
7850K

A. Employer Name, Address, I.D. No.
CLARIFY TEST/CON-ED/
CONSOLIDATED EDISON
4 IRVING PLACE
NEW YORK NY 10003
PH: 212-760-7937 FAX: 212-514-1227

B. MRO Name, Address, Phone No. and Fax No.
PARKHORSE JEUMEGHOSKOWITZ         FORM ID: NLA500020
CON EDISON MEDICAL REVIEW
4 IRVING PLACE, MED DEPT
NEW YORK NY 10003
PH: 212-780-7065 FAX: 646-654-2691

C. Donor SSN or Employee I.D. No. _____ 22095

D. Reason for Test: ☐ Pre-employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post Accident ☐ Return to Duty ☐ Follow-up ☒ Other (specify) _____ CSA

E. Drug Tests to be Performed: ☐ THC, COC, PCP, OPI, AMP ☐ THC & COC Only ☐ Other (specify) _____

☒ ( ) 22501N SAP 10-50 W/OPI/MET        ( ) 30380H SYN CANNABINOIDS III
( ) 23404N M BUPR_NAL(SUBOXONE)        ( ) 33721N 9 PANEL W/OPI 5D THC

F. Collection Site Name: _____ CON ED
Address: _____ WEST 28 #ST
City, State and Zip: _____ NYC

Collection Site Code: _____
Collector Phone No.: _____ 914 543020
Collector Fax No.: _____

STEP 2: COMPLETED BY COLLECTOR (make remarks when appropriate) Collector reads specimen temperature within 4 minutes.
Temperature between 90° and 100° F? ☒ Yes ☐ No, Enter Remark  Collection: ☒ Split ☐ Single ☐ None Provided, Enter Remark  ☒ Observed, (Enter Remark)
REMARKS

STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY TEST FACILITY
I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable requirements.

X
S. Forest
Signature of Collector
Print Collector's Name (First, MI, Last)        Date (Mo/Day/Yr.)  1/29/21   Time of Collection  4:32 PM

SPECIMEN BOTTLE(S) RELEASED TO:
☒ Quest Diagnostics Courier
☐ FedEx
☐ Other
Name of Delivery Service

RECEIVED AT LAB:
X
Harkishan Amin
Signature of Accessioner / Initiating Chain of Custody
Print Accessioner's Name (First, MI, Last)        Date (Mo/Day/Yr.)

Primary Specimen
Bottle Seal Intact
☒ Yes  ☐ No
If No, Enter remarks
In Step 5A.

SPECIMEN BOTTLE(S) RELEASED TO:

STEP 5A: PRIMARY SPECIMEN REPORT - COMPLETED BY TEST FACILITY
☐ NEGATIVE  ☒ POSITIVE for:  ☐ Marijuana Metabolites (aB-THCA)  ☒ Methamphetamine  ☐ MDMA  ☐ 6-Acetylmorphine  ☐ OXYC  ☐ MYC
☐ DILUTE  ☐ Cocaine Metabolite (BZE)  ☒ Amphetamine  ☐ MDA  ☐ Morphine  ☐ OXYM  ☐ HYM
☐ PCP  ☐ Codeine

☐ REJECTED FOR TESTING  ☐ ADULTERATED  ☐ SUBSTITUTED  ☐ INVALID RESULT
REMARKS: D-Methamphetamine   91 %   Amphetamine   100170  ng/mL
Test Facility (if different from above)   L-Methamphetamine   9 %   Methamphetamine   14336  ng/mL
I certify that the specimen identified on this form was examined upon receipt, handled using chain of custody procedures, analyzed, and reported in accordance with applicable requirements.

X
Signature of Certifying Scientist
DAVID WALLNER
Print Certifying Scientist's Name (First, MI, Last)        FEB 06 2021  /  Date (Mo/Day/Yr.)

STEP 5B: COMPLETED BY SPLIT TESTING LABORATORY
☐ RECONFIRMED  ☐ FAILED TO RECONFIRM - REASON:
I certify that the split specimen identified on this form was examined upon receipt, handled using chain of custody

FORENSIC DRUG TESTING CUSTODY AND CONTROL FORM

Quest Diagnostics

782655D

434 test

10380166     0684573   SPECIMEN ID NO.     0684573

Quest Diagnostics
400 Egypt Rd
Norristown, PA 19403

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**     LAB ACC

A. Employer Name, Address, I.D. No.
CLARITY TEST/CON-EDV
CONSOLIDATED EDISON
4 IRVING PLACE
NEW YORK NY 10003
PH: 212-780-7937 FAX: 212-514-1227

B. MRO Name, Address, Phone No. and Fax No.
BARBARIA JEANESCHUSKWITZ     FORM ID: RLA500020
CON EDISON MEDICAL REVIEW
4 IRVING PLACE, MED DEPT
NEW YORK NY 10003
PH: 212-780-7082 FAX: 646-654-2891

C. Donor SSN or Employee I.D. No.     22095

D. Reason for Test: ☐ Pre-employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post Accident ☐ Return to Duty ☐ Follow-up ☑ Other (specify)   CSA

E. Drug Tests to be Performed: ☐ THC, COC, PCP, OPI, AMP     ☐ THC & COC Only     ☐ Other (specify)

☒ (  ) 22303H 5OP 10-50 N/UPI/NIT     (  ) 30380H 5YR CANNABINOIDS III
(  ) 23404H O BUPR HCL(SUBOXONE)     (  ) 32721H 9 PANEL D/UPI NO THC

E. Collection Site Name:   CON ED
Address:   WEST 28TH ST
City, State and Zip:   NYC

Collection Site Code:

Collector Phone No.:   914.5430005
Collector Fax No.:

**STEP 2: COMPLETED BY COLLECTOR** (make remarks when appropriate) Collector reads specimen temperature within 4 minutes.

Temperature between 90° and 100° F? ☑ Yes ☐ No, Enter Remark   Collection: ☑ Split ☐ Single ☐ None Provided, Enter Remark   ☑ Observed, (Enter Remark)
REMARKS

**STEP 3:** Collector affixes bottle seal(s) to bottle(s). Donor initials seal(s).
**STEP 4: CHAIN OF CUSTODY – INITIATED BY COLLECTOR AND COMPLETED BY TEST FACILITY**

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service named in accordance with applicable requirements.

X   S. Fujara   (Signature of Collector)

(Print Collector's Name if rec., Ms. Last)

Date (Mo./Day/Yr.)   1/29/21     Time of Collection   4:32 PM

SPECIMEN BOTTLE(S) RELEASED TO:
☑ Quest Diagnostics Courier
☐ FedEx
☐ Other

RECEIVED AT LAB

X   Muralmihir Amin

(First & Intermediate Initial & Last of Chain of Custody)

(Print Accessioner's Name if rec., Ms. Last)   Date (Mo./Day/Yr.)   /   /

Name of Delivery Service

SPECIMEN BOTTLE(S) RELEASED TO:

Primary Specimen Bottle Seal Intact
☐ Yes ☐ No
If No, Enter remarks in Step 5A

Co 5 (d)